No. 21,255.

THE STATE OF KANSAS, *Appellee,* v. DON VAN WORMER, *Appellant.*

SYLLABUS BY THE COURT.

1. HOMICIDE—*Killing of Sheriff—Defendant Resisting Arrest—Instructions—Self-defense.* In a prosecution for a homicide which resulted in a conviction of murder in the first degree, the court instructed the jury that in order to convict they must find, in addition to the other elements constituting that offense, that the defendant killed the sheriff while he was resisting arrest by him under a warrant charging a felony. *Held,* that, under the conditions shown, the plea of self-defense was not available to the defendant if he killed the sheriff while resisting arrest, and, inasmuch as the verdict necessarily implied a finding (if the instructions were followed) that such was the case, the omission to instruct upon self-defense was not prejudicial, unless upon the theory that by reason thereof the jury may have been led to disregard the instruction referred to.

2. SAME—*Omission to Instruct Upon Self-defense and Lesser Degrees of Crime Not Error.* *Held,* that in such a case the omission to instruct upon self-defense, and upon second-degree murder and manslaughter, does not require a reversal, because upon the whole record the verdict appears to be based upon satisfying evidence, and there seems to be no substantial probability that the jury acted in disregard of the instructions given. The fact that a constable of the same county had already undertaken to take the defendant in custody on a charge of disturbing the peace, and to deputize two bystanders to guard and protect him, did not affect the right of the sheriff to arrest him, even if the conduct of the constable and his assistants was in good faith, and the evidence hardly leaves a doubt that it was collusive.

3. SAME. In such a case it is not error to instruct that "In every case where one person has a right to arrest or restrain another, the other

can have no right to resist since the two rights cannot coexist; and where a person thus having the right to arrest another is killed by the latter in the resistance of such arrest, the resistance is a crime, and the killing is a homicide in the commission of an unlawful act. No right of self-defense can arise out of such circumstances." Such instruction does not negative the right to resist the use of undue force by the officer, and, under the evidence in this case, it does not seem likely that the jury so interpreted it.

4. SAME—*Information—Verified before Notary Public.* The statute authorizing notaries public to "administer oaths pertaining to all matters wherein an oath is required" qualifies them to take the affidavit in verification of an information in a criminal case.

5. SAME—*Deposition of Absent Witness—Presence of Defendant Waived.* Upon the hearing of a motion to quash a jury panel in a felony case, evidence of the county clerk was used which was taken at his house on account of his sickness, the defendant not being present. The attorneys for the defendant were invited to attend the taking of the testimony, but declined. No request to be allowed to be present was made in behalf of the defendant, nor was any objection made to the proceeding until after the testimony had been read in evidence, and argument on the motion had been invited by the court. *Held,* that the defendant's rights to be present at the taking of the testimony were waived.

6. SAME—*Change of Venue Properly Denied.* A motion for a change of venue on the ground of prejudice of the judge, held to have been properly overruled.

7. SAME — *Stipulation for Taking Depositions — Continuance Properly Denied.* A stipulation was made by the county attorney for the taking of depositions in behalf of the defendant in a murder case, a waiver of the regular procedure being included. An attorney designated by the attorney-general to conduct the prosecution gave notice that while he would try to be represented at the taking of the depositions, if he failed in that he would challenge the validity of the stipulation, on the ground that it was collusive and unauthorized. The depositions were not taken, the defendant's counsel giving as a reason that they could not be filed one clear day before the trial and, therefore, could not be used except by agreement. A continuance was asked on behalf of the defendant to enable him to procure the evidence. *Held,* that it was a fair question for the trial court whether it should be granted, and its refusal did not constitute error.

8. SAME—*Competency of Jurors.* Rulings of the trial court sustaining the competency of challenged jurors held not to have been erroneous.

9. SAME—*Evidence.* Rulings admitting evidence held not to have constituted reversible error.

10. SAME—*Evidence.* Rulings excluding evidence held not to have been prejudicial.

11. SAME—*Argument of Counsel—Not Reversible Error.* The argument of counsel for the prosecution held not to have so far transgressed the proprieties as to require a new trial.

Appeal from Hamilton district court; GEORGE J. DOWNER, judge. Opinion filed July 6, 1918. Affirmed.

*S. B. Amidon, S. A. Buckland,* both of Wichita, *L. A. Madison,* of Dodge City, *Samuel Yaggy,* of Syracuse, and *F. S. Macy,* of Liberal, for the appellant.

*S. M. Brewster,* attorney-general, *G. Porter Craddock,* county attorney, *John W. Davis,* of Greensburg, *George Getty, Harry E. Walter,* both of Syracuse, and *Mayo Thomas,* of Elkhart, for the appellee.

The opinion of the court was delivered by

MASON, J.: On July 22, 1916, at Rolla, in Morton county, Don Van Wormer shot and killed Martin C. Moore, the sheriff. He was convicted of murder in the first degree, and appeals.

At about six o'clock in the afternoon of the day of the homicide the defendant was in his real-estate office, which was also his residence, with several friends. The sheriff came to the office with the purpose (according to his own later declaration) of arresting him upon the charge of having wounded one Lewis Perkins by shooting him, Perkins appearing to have been shot in the face shortly before by some one, probably the defendant, but his injury was not severe, and was doubtless accidental. However, this is not important in the present case. A conversation then took place between the defendant and the sheriff which was variously reported, but according to witnesses produced by the defendant, who were manifestly very friendly to him, he asked the sheriff if he had a warrant for him, and on receiving a negative answer ordered him to go on away, telling him to get a warrant if he wanted to arrest him, and saying that he was going to take a shot at his garage, which was opposite the door where the sheriff stood, so that he was nearly in line with it. The defendant almost immediately fired through the screen door with a shotgun, the charge striking the garage. The sheriff then went to a justice of the peace, procured a warrant charging the defendant with an assault upon himself with intent to kill, and returning to the defendant's office told him

he had a warrant for his arrest.   The defendant asked to see it, and the sheriff showed it to him.   There is a direct conflict as to what then took place.   One of the state's witnesses, the county's representative in the legislature, whose testimony was corroborated in all essential particulars by others, testified, in substance, that the defendant resisted arrest, and that his friends aided him, a violent scuffle ensuing; that the sheriff succeeded in getting the defendant through the door and out of the building, when he wrenched loose; that blows were exchanged, and another scuffle took place, the defendant's friends assisting him and striking the sheriff; that the defendant again got away and ran back into the house, procured the shotgun, and fired the fatal shot through the doorway; that the sheriff in the meantime, having been released by his assailants, had gone to a car near by, and returned with a revolver in his hand, and was standing near the door when shot.

The version of the affair undertaken to be given by the defendant's witnesses (including his friends who are charged with aiding him in resisting the officer), in its most favorable form for him (the state plausibly contending that it was much weakened upon cross-examination), was to this effect:   When the sheriff told him he had a warrant for him, the defendant asked him to read it; he answered that he did n't have to, at the same time producing the warrant, which the defendant took from his hand; as the defendant was reading the warrant, stepping back while he was doing so, the sheriff struck him a violent blow in the face, and followed it up with others; the defendant did not resist arrest, and his friends interfered no further than to protest against the sheriff's unnecessary violence.

1.  Many assignments of error are made.   That which we regard as the most important grows out of the fact that the court refused to give any instructions with regard to the law of self-defense.   There is little difference of judicial opinion with respect to the availability of self-defense as a plea in behalf of one who kills an officer who is endeavoring to arrest him.   If the officer is authorized to make the arrest and the accused knows it (as was clearly the case here), and the officer proceeds in a proper manner, no such issue can arise.   If the officer, however, although armed with a sufficient warrant,

The State v. Van Wormer.

uses unnecessary and unreasonable force, or wanton violence, this may be repelled under the ordinary rules of self-defense, even to the extent of taking life; but acts done in resistance of the arrest itself cannot be so justified under any conditions present in this case, although the distinction may not always have been noted. (13 R. C. L. 867; 5 C. J. 750; 21 Cyc. 803; Notes, 33 L. R. A., n. s., 143; 84 Am. St. Rep. 679; 4 Ann. Cas. 844.) Some courts go farther than others in applying the rule so as to protect the rights of the officer (see, for instance, *State v. Durham,* 141 N. C. 741), but there is a substantial agreement as to the principle by which cases of this kind are controlled, although there is some variation in the language used expressing it. It is held in Kentucky that a plea of self-defense is tenable where the defendant resists arrest and kills the officer attempting it, under a reasonable but mistaken belief that the officer is not acting in good faith. (*Fleetwood v. Commonwealth,* 80 Ky. 1; *Minniard, &c., v. Commonwealth,* 87 Ky. 213.) We think that doctrine too liberal to the accused, but in any event it would not apply here. We prefer the rule approved in the North Carolina case referred to, that where the officer to the defendant's knowledge has lawful authority to make the arrest, it is his duty to submit, and where he is resisting the process of the state, no right of self-defense can arise.

From what has already been said, it is clear that the evidence was sufficient to raise an issue involving the right of self-defense, and that instructions thereon would have been pertinent. However, most, if not all, of the prejudicial effect of the omission to instruct on that subject was cured by the fact that the jury were told in substance that there could be no conviction unless (in addition to finding all the elements of ordinary first-degree murder) they believed that the killing was done while the defendant was resisting arrest or was attempting to escape from the custody of the sheriff. The jury, therefore, by their verdict of guilty necessarily found (if they followed the court's instructions) that the homicide was committed in resisting arrest (or in escaping from custody, which under the circumstances here present is substantially the same thing), and this eliminated all question of self-defense, for that plea would not then be available.

2. The court might well have told the jury that if they believed the defendant resisted arrest the element of self-defense could not enter into the matter, but that if they concluded that he did not resist arrest (or if they were not convinced of the fact beyond a reasonable doubt) then they should further consider whether, in killing the sheriff, he acted under a reasonable belief that the act was necessary to protect himself from great bodily harm or death. If the jury faithfully followed the charge of the court, the omission of the instruction regarding self-defense was not material, because, having decided that the defendant did resist arrest, they would have had no occasion to apply such an instruction. The doubtful question is whether the failure to submit this issue may have influenced the jury in their finding upon the matter of resistance of arrest. It had no legitimate or logical bearing thereon—it could not affect the decision of the jury if they followed their instructions —but the question is whether it might have led to a disregard of them, and so resulted in a verdict which otherwise might not have been agreed to. This question associates itself closely with another—whether reversible error was committed in instructing that but two verdicts were possible—that there must be either a conviction of murder in the first degree or an outright acquittal. The same situation is presented—if the defendant killed the sheriff while resisting arrest, or attempting an escape therefrom, he was guilty of murder in the first degree, because such resistance or escape is itself a felony (Gen. Stat. 1915, §§ 3553, 3572), and a homicide committed in the perpetration of a felony, being murder at the common law (21 Cyc. 710, 716, 717), is made first-degree murder by the statute. (Gen. Stat. 1915, § 3367.) That the killing was done under such circumstances need not be specifically pleaded. (21 Cyc. 840.) If the jury followed the directions of the court, their verdict, as already stated, implied a finding that the defendant did kill the sheriff while resisting arrest, rendering him guilty of murder in the first degree, and they had no occasion to know what would constitute second-degree murder or manslaughter. But if the jury had concluded that the defendant did not resist arrest, then they would have had need to know the constituents of these inferior degrees, and the question remains: Is there a reasonable probability that the omission to

give them that information for their use in that contingency (which did not occur) influenced them in deciding the separate and independent question whether the defendant resisted arrest? Convictions of murder in the first degree have been set aside by this court because of the omission to instruct upon the lower degrees of homicide, where such an instruction was warranted by any reasonable theory of the evidence. (*The State v. Curtis*, 93 Kan. 743, 145 Pac. 858.) But it does not follow, nor is it true, that a reversal is always required in such a case. Of that situation it has been said:

"Where the jury under proper instructions have found a defendant guilty of every element of the superior offense, erroneous instructions or a total failure to instruct with reference to an offense inferior in degree and including less criminality cannot, logically, be said to have influenced the jury. The failure of the court can only be said to be prejudicial to the defendant on the theory that the jury failed to fully comprehend the definition of the superior degree, or misconstrued and misapplied the law to the facts. To indulge in such presumptions, even though we know that mistakes are made by juries and courts alike, is to overturn the whole theory of the administration of justice." (*The State v. McCarty*, 54 Kan. 52, 59, 36 Pac. 338.)

"Generally error in failing to instruct or in giving wrong instructions upon lesser degrees or offenses works no prejudice when the defendant is convicted upon satisfying evidence of a higher charge, under correct instructions relating to it. Should it appear that if omitted instructions duly requested or clearly required by the evidence had been given the jury might naturally and probably have convicted of a lesser degree or offense, the omission will constitute prejudicial error." (*The State v. Winters*, 81 Kan. 414, 421, 105 Pac. 516.)

The problem is the familiar one of determining whether an erroneous ruling in the presentation of a case to the jury is of such character as to require the setting aside of a judgment founded upon their verdict. Where the matter, for instance, is one of the admission of incompetent evidence, the question is not what effect the objectionable testimony has upon the appellate court's opinion of the facts, but what effect it may be presumed to have had upon the jury. A judgment must often be reversed without the reviewing court being at all sure that the error committed influenced the verdict; and, on the other hand, judgments may sometimes be affirmed without the reviewing court being sure that the error did not influence the verdict. Absolute certainty is not necessary or practicable.

The mere possibility of prejudice is not enough to require a new trial; nor does the test to be applied admit of a more precise statement than that the tribunal charged with the duty of deciding upon the materiality of the erroneous ruling shall, according to its best judgment, determine whether there is such a reasonable likelihood of its having affected the verdict that the interests of justice require a new trial.

In the present case there is much to indicate that, notwithstanding any errors committed, the jury have decided the vital matters in dispute exactly as they would have done if every rule of procedure had been strictly followed, and have reached a conclusion that the defendant is guilty of murder in the first degree, upon satisfactory evidence of that fact. The real controversy was whether the defendant resisted arrest. A part of the testimony given in his behalf tended to prove that he merely resisted the exercise of undue and unreasonable violence by the sheriff, but the jury clearly discredited this claim, upon abundant evidence, the force of which cannot be fully appreciated without a statement of a subsidiary issue that was brought into the case by him. He did not take the stand himself, nor was any statement to the jury of his defense, or any argument to them in his behalf, made by his counsel. But from the evidence given by his witnesses, and from the offers of proof made by his attorneys, it is plain that he relied upon a claim that before the sheriff attempted to serve his warrant the defendant had been placed under arrest by a constable, who had deputized two bystanders to take charge of him, and that by reason of his being already in their custody the sheriff had no right to take him in charge. Much of the evidence introduced and offered by the defense was in relation to this matter. It is difficult to discover any bearing of this on the merits, unless as a justification of resistance to the arrest by the sheriff. The trial court, by various rulings, held in substance that the acts of the constable interposed no legal barrier to the service of the warrant by the sheriff. Assuming that the constable was authorized to make an arrest, and that he and his purported deputies were acting in good faith, the sheriff was entitled to take charge of the defendant, because he held a warrant charging the commission of a felony, while the offense for which the constable undertook to hold him was that of dis-

The State v. Van Wormer.

turbing the peace, and the sheriff was the principal peace officer of the county, in aid of whom the constable professed to be acting. Moreover, it is difficult to believe that the evidence leaves any room for substantial doubt that the sole purpose of the purported arrest by the constable, and the placing of the defendant in charge of his two friends, was to obstruct the sheriff in his attempt to arrest him. This being a matter of the greatest importance, as bearing upon the real merits of the case, a statement of a part of the evidence in some detail seems warranted. The constable testified that he followed the sheriff on his first trip to the defendant's office because some one called to him that the sheriff wanted a man to go with him, his purpose being to assist him; that he made the arrest after the sheriff had left to get a warrant; that later he put the defendant in charge of Walter Littell and J. E. McCarty, and went to the justice of the peace and obtained a warrant (without filing a complaint) charging the defendant with disturbing the peace. A part of his cross-examination with regard to the circumstances attending this arrest reads as follows:

"Q. You have said that you went up and placed Don Van Wormer under arrest, on the charge of disturbing the peace, because of something that Walter Littell came and said to you. That's correct, is n't it? Now I will ask you if that is correct? . . . A. Well, yes.

"Q. What did Walter Littell say to you that caused you to go and put Don Van Wormer under arrest, on a charge of disturbing the peace? A. He says 'Don [the defendant] wants to see you, Fred,' were his exact words.

"Q. Is that all that he said that caused you to go? A. Yes, sir.

"Q. And then you walked right in and put Don under arrest, for disturbing the peace, did you? A. I walked right in and Don surrendered to me.

"Q. And you put him under arrest for disturbing the peace, did n't you? . . . A. I fetched no charge against him, sir.

"Q. Well, what did you arrest him for? A. Because he surrendered to me.

"Q. Well, on what charge did you take him into your custody? A. As I said, no charge. He preferred no charge against him.

"Q. Have n't you said that you did that on the ground of disturbing the peace? A. That was my warrant that I got.

"Q. But did n't you—for what reason did you take him into your custody, without the warrant? A. Because he surrendered to me.

"Q. Surrendered to you? What had he done to surrender to you, on any kind of a charge, or for any reason whatever? . . . A. He told me he wanted to surrender to me.

"Q. On what charge?   A. There was no charge mentioned at that time.

"Q. Well, on what charge did you hold him?   A. As I said, I had n't fetched no charge against him.

"Q. Did he say why he wanted to surrender to·you?  .  .  .  A. Well, yes.

"Q. He made a statement to you? A.  Yes, sir.

"Q. What did he say he had done, for which he wanted to surrender? A.  He says 'I am willing to surrender to my home officer.' "

[This answer was stricken out, as not responsive to the question, but it was later repeated in substance.]

"Q. What crime did he say he had committed, that he wanted to surrender to you?  Or for any crime?   A. He did n't say any crime.

"Q. He did n't say any crime?   A.  No, sir.

"Q. No crime at all?   A.  No, sir.

"Q. Now you say that when you first went up there without a warrant, you did n't take him into your custody or charge, because he had disturbed the peace?   A.  I arrested him.

"Q. For disturbing the peace?   A.  I had no—I preferred no charge against him.

"Q. You did n't?   A.  No, sir.

"Q. Well, why did you arrest him?   Q.  .  .  .  What reason did you act upon in going into his office at the time you went in, that night, without any warrant and putting him under arrest?  A.  To enforce the law.

"Q. To enforce what law?   A.  The laws of the state of Kansas.

"Q. What law?   What particular law were you enforcing?  A.  Well, the laws in general.

"Q. Well, what one, individually?  Any one?   A.  No.  Had no particular law."

The justice of the peace who issued both warrants testified that the first warrant was upon a charge of disturbing the peace—a "general charge"—"there was no particular person mentioned"; that he issued it to the constable, at his request, to hold the defendant in custody while he should see about the sheriff's complaint and warrant—whether he would still issue it or not; that his intentions a moment after handing the warrant to the constable were that he should hold the defendant until the sheriff should arrive with his warrant.

The defense made an offer (which was rejected) to prove by the constable "that when the sheriff came there, this witness and the Littells and McCarty, being the parties with whom he had left the defendant, in their charge, told the sheriff that they had a warrant for the defendant, and they were about to take him down to Justice Perkins' place for trial, and told him that they would not permit him, the sheriff, to take him away

The State v. Van Wormer.

from them, and ordered the defendant not to go with the sheriff, and that this order was made in the presence of Moore." J. E. McCarty, one of the persons deputized by the constable, testified in chief that the constable said that they should guard and "protect" the defendant, a statement which was stricken out by the court on motion of the state. The defense then offered (the offer being denied) to show that the constable said to the witness: "I don't want you to give him [the defendant] up to any body, and I don't want you to let anybody take him away." An offer was also made to show that Walter Littell said to the sheriff, speaking of the defendant: "He is already under arrest. He is our prisoner. We are ordered to hold him, and we are going to hold him." McCarty testified that he told the sheriff "for him to just wait until Fred Thompson came and relieved us and he could have him."

Of course, the defendant is not absolutely bound by the statements of his witnesses. But the trend of the testimony generally, as well as of the particular passages referred to, is to show that the attitude of the defendant was that he had a right to resist arrest because he was already in charge of the constable. As already indicated, we hold that the arrest by the constable would have offered no justification for resistance to the sheriff, if it had been absolutely regular and in good faith. And it may be said, almost as a matter of law, to have been a mere sham and pretence; there is so little room for a real doubt on the subject. It clearly originated with the defendant as an excuse for resisting the sheriff, and the conclusion is almost irresistible that those participating in it were acting from the same motive. But if they were actually under a misconception as to their duty in the matter, this could not avail the defendant.

In view of these considerations, we feel entirely confident that the decision of the jury, that the defendant killed the sheriff while resisting arrest, and was therefore guilty of murder in the first degree, was based upon satisfying evidence, and was not influenced by the omission of the court to give instructions as to what the verdict should be in case they failed to find that fact. It follows that a reversal is not required by the absence of instructions regarding self-defense and the inferior degrees of crime.

The argument against this view is that the jury, although not convinced that the defendant had resisted arrest, may have felt that he ought not to escape punishment altogether, and may have been moved by that consideration to disregard the instructions of the court and return a verdict of murder in the first degree to avoid an absolute acquittal. If the element of resisting arrest were not in the case, the fact that the jury were not given an opportunity to decide between first- and second-degree murder, according to whether or not they found the homicide to have been deliberate and premeditated, would have left more room for invoking this theory, because the one degree of the crime ordinarily so grades into the other as to give greater opportunity than is here presented for choice between them, and make the formation of a satisfying decision on the subject the more difficult. But the question whether the defendant resisted arrest was a matter of physical fact, more readily and definitely determinable than one concerning a state of mind—and it was the outstanding issue of the case, about which everything else revolved. The possibility that the jury may have proceeded upon the ground suggested, appears to us to be too remote to be made a reason for ordering a new trial.

3. In behalf of the defendant, it is urged that the instructions of the court amounted to a peremptory charge to convict, because they, in effect, advised the jury that all that was necessary to require a conviction was that the sheriff should have attempted to arrest the defendant, and should have been killed by him. We do not think this a fair interpretation of the instructions. The distinction between resisting an arrest and resisting unjustifiable violence of the officer making the arrest is not obscure, but is one readily grasped by the jury, and the charge as a whole made it clear that the issue was whether the defendant resisted the lawful demands of the officer.

The court instructed the jury in these words:

"In every case where one person has a right to arrest or restrain another, the other can have no right to resist, since the two rights cannot coexist; and where a person thus having the right to arrest another is killed by the latter in the resistance of such arrest, the resistance is a crime, and the killing is a homicide in the commission of an unlawful act. No right of self-defense can arise out of such circumstances."

This is criticised in the defendant's brief, where it is said:

"In the first place, the court was absolutely wrong; the two rights can exist as we have heretofore shown by the citation of a number of authorities, whose reasoning cannot be questioned. The right to arrest can exist, but if that arrest is attempted to be made in an unlawful manner, the right to resist the same can also exist."

The entire instruction quoted is transcribed literally from a recent text (13 R. C. L. 867), the first sentence being taken from a note in 66 L. R. A. 356, and based in part upon language used in *State v. Albright*, 144 Mo. 638, 653. We do not think the instruction open to the construction which the defense seems to place upon it. It does not negative the existence of a right to resist the use of undue force by the officer, and, under the evidence here, we do not think the jury were likely to so interpret it. Elsewhere the jury were told that "if . . . the defendant grabbed the warrant from the sheriff's hands and refused to give it back to him, then it was the duty and privilege of the sheriff to use such force *as necessary* to make the arrest," and also that "he would be justified in using such force *as necessary* in recovering possession of the warrant and in making the arrest." They were also told that a defendant is bound 'to submit to a known officer, and yield himself immediately and peaceably, before the law gives him a right to have the warrant read, or to inspect it, "and when in resistance the law shows him no favor." The words quoted are criticised as not being the law. The statement is somewhat general, but we think it entirely true, and not misleading.

Complaint is also made of the giving and refusal of various other instructions, but if any error was committed in this regard it was with respect to the matters already discussed, and, upon the same reasoning, we hold it to have been nonprejudicial.

4. The contention is made that the information was not properly verified, because the affidavit thereto was taken by a notary public. In some jurisdictions this is not sufficient, but our statute provides that notaries are "authorized to administer oaths pertaining to all matters wherein an oath is required." (Gen Stat. 1915, § 6744.) This includes taking affidavits in criminal proceedings. In one case a different conclusion has been reached (*Richards v. State*, 22 Neb. 145), but we disagree

with it. In another case the ruling is affected by the absence of a statute. (*Bowes v. State*, 7 Okla. Cr. 316.) The competence of a notary public to administer the oath in such a case is upheld by other courts. (*Mitchell v. State*, 126 Ga. 84; *State v. Mullen*, 52 Mo. 430.) Moreover, no objection appears to have been made to the verification, and the irregularity, if there had been one, would have been waived. (*The State v. Blackman*, 32 Kan. 615, 5 Pac. 173.)

5. A motion by the state to quash the first panel of jurors drawn was sustained. Upon the hearing, evidence of the county clerk was used which, on account of his sickness, had been taken at his house, the defendant not being present. The defendant asserts that his constitutional right to meet the witness face to face (Bill of Rights, § 10), and the requirement of the statute that no person informed against for a felony can be tried unless he be personally present (Gen. Stat. 1915, § 8121), were both thereby violated. Counsel for the defendant were expressly given an opportunity to attend the taking of the testimony, and refused to avail themselves of it. No request was made by or in behalf of the defendant to permit him to be present, nor was any objection made to the proceeding until after the testimony had been introduced and the court had inquired whether the defense had anything to say before the motion was passed on. The rights of the defendant in respect to being present when the testimony was given, both under the constitution and under the statute, may be waived (*The State v. Way*, 76 Kan. 928, 93 Pac. 159; *The State v. Adams*, 20 Kan. 311), and we hold that under the circumstances they were waived by the failure to ask permission to exercise them, and by the failure to make an earlier objection. (*The State v. Stratton*, ante, p. 226, 173 Pac. 300.)

A special venire was selected by the court from the assessment rolls. The defendant moved to quash it because it had not been shown (except by the clerk's testimony) that there was no jury box containing a proper list of names, and complains of the overruling of the motion. This involves the same question, and requires the same ruling.

6. The case had been taken to Hamilton county for trial. A motion for a further change of venue on the ground of prejudice of the judge was made and overruled. Whether or not

the evidence introduced by the defendant on the motion was sufficient to make a *prima facie* case, the statement of the judge himself showed abundant warrant for denying the motion. (*City of Emporia v. Volmer,* 12 Kan. 622.)

7. This motion for a change of venue was overruled on December 7, 1916. The court then set the case for trial on Monday, December 11. On December 2 a stipulation had been entered into by the attorneys for the defendant and the county attorney of Morton county, for the taking of the depositions of witnesses in behalf of the defendant at Bethany, Harrison county, Missouri, on December 9, the stipulation including a waiver of a special commission, and an agreement that the depositions should be taken and read in evidence and used in all particulars "as though taken with all the provisions of law provided for taking the same having been fully complied with." On the 7th of December the defendant's attorneys objected to the case being set for December 11, on the ground that depositions taken in Missouri on December 9 could not possibly be filed, as the code of civil procedure requires (Civ. Code, § 359), at least one clear day before the day of trial; and that the county attorney who had made the stipulation had informed the defendant's attorneys that he could not live up to the agreement—that John W. Davis, an attorney assigned to the prosecution by the attorney-general, had told him (the county attorney) he had no right to make such an agreement, and that it was a device on the part of the defendant's attorneys to get perjured testimony. This colloquy took place between counsel:

Defendant's attorney: "The attorney who now claims to represent the attorney-general, has here to-day, in open court, disavowed this agreement, and claims it was obtained by fraud and collusion. We would like to know at this time, whether he wants to stand by that disavowal, or whether he wants to go ahead and take the depositions."

Mr. Davis: "I decline to be cross-examined. These gentlemen can take their depositions. The law provides how they shall get their testimony. If they have gone into some unauthorized agreement, they can take the consequences of it. We are going to be represented at the taking of those depositions, providing the distance is not too great for us to reach there, and that will probably settle the controversy."

Defendant's attorney: "We don't want to go on a wild-goose chase. You now state in open court that you are not going to stand by that agreement, do you?"

Mr. Davis: "You have gone into an agreement regarding the taking of these depositions, forty-eight hours before this trial, and if you do

not get your depositions here and they are not lawfully made, we will try to suppress them. You can take your own chances on that, sir."

Defendant's attorney: "Our agreement was in regard to taking and using the depositions. It covered the using of them also."

When the case was called for trial, on December 11, an application for a continuance was made by the defendant's attorneys on the ground that they needed the evidence of the witnesses in Missouri, which they had not taken on December 9, on account of the matters already stated, and because, without a waiver, such depositions could not be used unless on file one clear day before the 11th, and that it would be impossible to get them on file that soon. The court overruled the application, saying to the defendant's attorneys:

"The court, when you gentlemen were discussing this matter on last Thursday — I think right after Mr. Amidon had asked Mr. Davis whether they were going to stand on this agreement or not, or whether they were going to deny the agreement—and after you had discussed this matter for some little time, I said to you gentlemen that Mr. Davis had said something about if they could get there and cross-examine these witnesses, if they could make their arrangements to get there, they would do so and would appear and cross-examine them if they had the time in which to get there. If they could get there and cross-examine and take their testimony, they intended to do so, and I said then, that this matter then would not come up at all, in case they did get there and cross-examine, this would not have come up, and of course, if you gentlemen had appeared there and taken this testimony, you would then be in a different position. The court certainly would not have forced you into trial if those depositions had been suppressed, but you did not appear there, neither did your witnesses appear, and the state had a representative there."

We think it was a fair matter for the trial court to determine whether or not he should grant the continuance, in view of the fact that the attorney in charge of the prosecution had said that the state was going to be represented at the taking of the depositions if the distance was not too great for one of its attorneys to get there, and that that would probably settle the controversy. The prosecution had given notice that it would challenge the validity of the agreement (in case it failed to have a representative at the taking of the evidence), but no ruling of the court had been made that the stipulation was collusive or unauthorized. Had the depositions been taken, it is clear that if they had been attacked the court would either

have held them to be admissible or else have granted time for retaking them.

8. Objections are urged to the competency of a number of jurors on the ground that they had formed opinions on the merits of the case prior to their selection. Some of their statements had a tendency to support this claim. But the question upon which the acceptance or rejection of a juror turns is, not whether he says he has an opinion, but whether, as a matter of fact, he has such an opinion as under the law constitutes a disqualification. He may describe as an opinion a state of mind which could more accurately be called a mere passing impression. His actual mental condition forms a question of fact for the determination of the trial court upon oral testimony, and a decision made under such circumstances can be reversed by a court which has not had the advantage of seeing and hearing the jurors, only when it is clear that a wrong result was reached, or that there has been an abuse of discretion. (*The State v. Stewart*, 85 Kan. 404, 116 Pac. 489.) We think such a condition is not shown here.

9. Complaint is made of the overruling of various objections to the admission of evidence. Several answers that are objected to were stricken out, but it is asserted that prejudice nevertheless resulted because they were afterwards referred to by counsel for the prosecution. We do not think the probability of prejudice sufficient to justify a reversal. Witnesses were permitted to testify to the appearance of the defendant— that he looked angry, that he appeared to have been drinking, that he seemed cool and unconcerned, and that he seemed to be tempting the sheriff. There are cases holding such testimony incompetent, but we regard the modern tendency to the contrary as based on the sounder reason. (3 Wigmore on Evidence, § 1974.) A witness was allowed to testify that two or three seconds after the shot through the screen door the sheriff said to him, "I don't want to hurt him. I am going to get a warrant just to please him." He added that this was not in the presence of the defendant; but it was so soon after the shot that it may perhaps be considered a part of that transaction. What the sheriff said would of course not be admissible as evidence of the facts declared, merely because of his being the person the defendant was charged with murdering; but these

expressions may have been competent as indicating his state of mind. (3 Wigmore on Evidence, § 1732.) In any event, we do not think their admission sufficient to constitute a ground for reversal. A witness for the state testified that after hearing Van Wormer say, "Wait till I get my gun," just before the fatal shooting, he ran away. The witness was asked whether this was because he considered the defendant a dangerous man. Over objection, he was permitted to answer, and complaint is made of this. But, as he answered "No," it is difficult to see how the defendant could have been prejudiced. The witness added something to this answer, but the court struck it out. The defendant insists that the effect was injurious to him, because the question was then asked: "Are those the reasons for your running away?" and answered in the affirmative. No objection was made to this question or answer, and the witness had previously given his reasons, to which they could apply, namely, that he was afraid there would be some more shooting, and he did n't want to be close.

The state introduced in evidence the screen door through which the shot was fired. The defendant asserts that thereby his privilege against self-incrimination was violated, because the door, belonging to him and in his possession, had been taken away without his consent. That the state obtained the door unlawfully is not a just ground for refusing to admit it in evidence, inasmuch as the defendant was not compelled to surrender or produce it by testimonial process or order of the court. (The State v. Turner, 82 Kan. 787, 109 Pac. 654.)

The state was permitted to prove that the sheriff had a wife and five children, whose ages were shown. This was quite outside the issues, but we think it would not be reasonable to suppose that the jury were influenced by it.

10. The court rejected evidence offered by the defendant intended to show that he was already under arrest when the sheriff returned with the warrant, and that the sheriff was so informed. As has already been said, we agree with the trial court that the purported arrest by the constable could not constitute a defense, nor have any mitigating effect. Some evidence offered for this purpose and rejected was doubtless competent as showing the circumstances of the homicide, but all the essential matters were brought out with reasonable fullness. Evidence of the extent of injuries received by the

defendant in the struggle was ruled out, perhaps unnecessarily, but this was not a vital matter. The volume of evidence was great. Much of it had only a remote connection with the real controversy. We think all was admitted that was necessary to enable the jury to reach a just result.

11. A final complaint is made of the argument of counsel. It seems unnecessary to state in detail the specifications under this assignment. We do not think the rules of propriety were so far transgressed as to call for a vacation of the judgment.

The judgment is affirmed.

### ORDER STRIKING PETITION FOR REHEARING FROM FILES.

On July 15, 1918, a petition for a rehearing was filed in behalf of the defendant. On the same day an order was made to the effect that, in view of a suggestion that the defendant had failed to surrender himself to the sheriff of Hamilton county in accordance with the order of the court, the petition for a rehearing would not be considered on its merits until such surrender was made, and that unless it was made by July 26, 1918, the petition would be stricken from the files. Such surrender not having been made, the petition for a rehearing is on the 29th day of July, 1918, ordered stricken from the files.