(No. 18648.—Judgment affirmed.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* MARTIN J. DURKIN, Plaintiff in Error.

*Opinion filed April 21, 1928—Rehearing denied June 13, 1928.*

1. CRIMINAL LAW—*when proof of other offenses is admissible.* Proof of other crimes cannot be shown to prove a habit or predisposition of the accused on the ground that such proof would show a probability of the defendant's guilt of the crime charged, but the test of admissibility of evidence is always the connection of the facts proved with the crime charged and whether it tends to show the defendant guilty of that crime, and if it does, it is competent evidence though it tends to show him guilty of other offenses.

2. SAME—*what evidence of another crime is admissible.* In a prosecution of a defendant for killing a police officer when he attempted to arrest him, the fact that warrants had been issued for the arrest of the defendant for previous crimes may be shown as affecting the motive for the killing; and it is proper to show that complaint had been made to the officers and that they were looking for the defendant on that account, but it is improper to show the details of the previous offense.

3. SAME—*it is always proper to prove motive.* Where a deliberate criminal act is established by the evidence the People are not required to prove a motive for the act, but the presence of a motive which would lead the accused to commit the act charged is always important in the consideration of the question whether the act was done with criminal intent.

4. SAME—*what is proper testimony of details of arrest.* Testimony of the police officers who arrested the defendant that they found two pistols in his possession, and the conversations which passed between them and the defendant at that time, are competent as evidence of the details of the arrest.

5. SAME—*what is proper remark in opening statement.* Where the defendant is being tried for the murder of a police officer who attempted to arrest him, it is proper for the State's attorney to state in his opening statement that the State would prove that at the time of the homicide the defendant was a fugitive from justice, as it is competent to show that fact as affecting his motive and his attitude toward anyone who attempted to arrest him.

6. SAME—*what instruction is not improper as assuming facts.* In a prosecution for the murder of a police officer who attempted to arrest the defendant, an instruction stating that one has no right

to resist arrest where the right to make the arrest exists is not improper as assuming the existence of the right to make the arrest, as it does not assume any fact but merely states the law, nor does it negative the right to resist undue force on the part of the officer making the arrest; and the giving of such instruction is not error where other instructions fully cover the subject of self-defense.

7. SAME—*what instruction as to malice is not improper as ignoring self-defense.* In a prosecution for murder, an instruction that malice aforethought may exist even though the intent to kill was formed on the instant is not misleading as ignoring the defense of self-defense, where it does not direct a verdict and where the jury are fully instructed by other instructions as to the defendant's rights under his plea of self-defense.

8. SAME—*when instruction involving manslaughter is properly refused.* In a prosecution for the murder of a police officer who attempted to arrest the defendant, where no evidence is offered on either side that can be said to form the basis for a manslaughter verdict, it is proper to refuse an instruction that "the intent to kill may not be an intent to commit murder but to take the life of another in self-defense or upon that sudden heat of passion which reduced the crime of killing to manslaughter."

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. HARRY B. MILLER, Judge, presiding.

EUGENE L. MCGARRY, ROLAND V. LIBONATI, and ELWYN E. LONG, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, ROBERT E. CROWE, State's Attorney, and ROY D. JOHNSON, (HENRY T. CHACE, JR., EDWARD E. WILSON, and LOUIS N. BLUMENTHAL, of counsel,) for the People.

Mr. JUSTICE STONE delivered the opinion of the court:

Plaintiff in error was convicted in the criminal court of Cook county of the murder of Edwin C. Shanahan, a special agent of the United States Department of Justice. The jury fixed his punishment at thirty-five years in the penitentiary. He has sued out a writ of error from this court to reverse that judgment.

On Sunday evening, October 11, 1925, about six o'clock, plaintiff in error, Durkin, otherwise known as Marty Westford, drove a Packard sedan car into the garage of Porter Bros., located at 6231 Princeton avenue, in Chicago. Shanahan approached him and attempted to arrest him for stealing the car then in his possession. He drew a revolver and shot Shanahan twice, one bullet entering his body near the heart, the other striking him in the right arm. Of these wounds Shanahan died an hour or two thereafter.

The evidence of the People tends to show the following: On the night of September 23, 1925, plaintiff in error broke open and entered the show-room of D. E. McDonald, in Pasadena, California, and removed therefrom a Packard automobile carrying model block No. 56181 and serial No. 65227. At that time he was accompanied by Elizabeth Andrews, known in this record as Betty Andrews. They drove to McDonald's place in a Chrysler roadster. The place was dark at the time of the theft. From the room where the car was stolen plaintiff in error drove it to Hollywood, California, Betty Andrews following in the roadster. From Hollywood she drove the Packard to a garage in Santa Monica, while plaintiff in error drove the roadster. They then left in the Packard car for Chicago, taking with them a child of Betty Andrews, driving by way of Albuquerque, New Mexico, where they picked up Harlow George and his wife and baby, arriving in Chicago on the 7th or 8th of October. Attached to the Packard car was a California license plate. On arriving in Chicago, plaintiff in error, Betty Andrews and her son and George and his family went for the night to the home of Clarence Ward, whose wife is an aunt of Betty Andrews. The next day after their arrival George attempted to take from the home of Ward some of the clothing his wife had left there and some other articles of clothing which belonged to plaintiff in error, who was known to Ward as Marty Westford. Ward ordered George to leave his house. On Friday morning,

October 9, Ward told plaintiff in error that he had stopped
George from taking these articles and had put him out of
the house, and that as he was leaving, George, who was
angry, said: "I can get you all in trouble by turning West-
ford in to the police; this car is a 'hot' car; the other stuff
was stolen." Ward testified that plaintiff in error denied
the car was stolen but said that he bought it in California;
that it could be called a "hot" car because he owed $800 on
it and had driven it out of the State, but he was going back
and pay that amount before the next note was due. Ward
testified that he told plaintiff in error that George said he
was going to turn him in to the police. This car driven by
plaintiff in error from California was kept in the alley back
of Ward's home. On October 9 George communicated with
the United States Department of Justice, and the deceased,
Shanahan, and special agent James Rooney, were assigned
to arrest plaintiff in error. On Saturday, October 10, these
men, with two Chicago police officers, Naughton and Rab-
bit, met George and received from him information that the
Packard was a stolen car and that plaintiff in error kept
a pistol in the pocket of the car. On Sunday afternoon,
October 11, Shanahan, Rooney, the two police officers and
George met near the garage of Porter Bros. About 5:15
o'clock plaintiff in error drove the Packard car into the Por-
ter garage, followed by a Hudson car. Plaintiff in error
was accompanied by Louis Jenkins, Andrew Cserep and
Clarence Ward. Durkin and Ward rode in the Packard
and Jenkins and Cserep in the Hudson. Jenkins had been
called by Durkin that morning to do some repair work on
the motor of the Packard car and had worked on it in
the alley back of Ward's residence until about five o'clock.
They drove into the garage to fill the radiator with water.
After so doing they all left the garage and went to a near-
by restaurant for food. About six o'clock on that same
evening Durkin, unaccompanied, again drove the Packard
car into the Porter garage. This garage is located on the

east side of Princeton avenue, a street extending north and
south. The garage had two driveway-doors—one at the
southwest corner and one at the northwest corner. The
garage is located on the north side of and adjacent to an
alley. Durkin drove out of the alley onto Princeton avenue,
circled his car and drove in at the south door of the garage.
He stopped the car facing east, about twenty-five feet east
of the south entrance, opposite a gasoline pump. Porter,
owner of the garage, and his assistant, Freeman Longtin,
were standing just outside the garage, near the south door-
way. Porter had been informed by the officers that they
were looking for Durkin. When the latter drove into the
garage Longtin started over toward the gasoline pump, and
Porter told him not to go in. Shanahan was at that time
standing across the street. The other officers and George
had left, temporarily. Shanahan entered the north door
of the garage alone and approached Durkin, who was lean-
ing over the left front door of his car with his back to the
north. Shanahan, with a gun in his right hand, touched
Durkin, who wheeled around. Porter and Longtin saw
Shanahan enter the garage and accost Durkin. They saw
the two talking but could not hear what was said. They
saw Durkin turn toward his car and back toward Shanahan,
and two shots immediately followed. Shanahan immedi-
ately fell back out of the view of these witnesses. Durkin
sprang into the car and was backing out of the garage when
several more shots were fired from the place where Shana-
han had fallen. Durkin drove north on Princeton avenue
and disappeared. These witnesses testified that they saw
Shanahan, before the shooting, throw back the left side of
his coat with his left hand. The evidence also showed that
Shanahan carried the badge of his office pinned in or on
his lower left vest pocket.

Shanahan was found lying on the floor of the garage,
just north of where the car was standing, with his head to
the north. He had been shot with two 32-caliber bullets.

One bullet was later found in his body, and the other, which had passed through his forearm, was found on the floor at the door leading into the office of the garage, having struck the jamb of the door about two inches from the floor. Shanahan's gun contained four discharged shells and two loaded ones. Two empty shells from a 32-caliber automatic were also found on the floor of the garage. Shanahan's gun was 38-caliber. One bullet fired by him grazed a pipe in the ceiling, directly above the place where the Packard stood, and passed through a skylight. The second bullet struck an overhead radiator pipe in the southwest corner of the garage and deflected into the south wall. The third bullet struck the left front door of the Packard seventeen inches above the bottom of the door and eight inches to the right of the hinges. It shattered the glass, which was lowered into the door, and dropped into the space inside the door without passing through the door. A fourth bullet apparently passed through the open space in the top of the left front door over plaintiff in error's head, struck the top of the car almost directly above the seat, and passed out of the top about six inches toward the right of the car and two inches to the rear of the point of entrance. The evidence shows that these four shots were fired from the floor and demonstrates that they were fired by Shanahan after he fell.

The Packard car was recovered by the police that night in a private garage at the rear of 519 Englewood avenue. Later that evening, Cserep, with Jenkins, the latter having been called by Durkin and requested to meet him, met the latter at Seventy-seventh street and Lowe avenue. As they approached that point in Jenkins' car Durkin stepped from behind some cars parked there and entered the car with them, directing Jenkins to drive straight ahead. They asked Durkin what he had done with the Packard car, to which he made no reply. After repeating the question several times, however, Durkin replied, "The other fellow took the

Packard." Jenkins took Durkin and Cserep to the latter's home on Watt avenue, in Pullman. Cserep invited them to come in and have a cigar. The three men entered the house, and while there Durkin asked for a razor. Cserep got a razor, shaving brush and soap and took Durkin to the bath-room, where he shaved off his mustache. Cserep testified that he asked Durkin why he was cutting off his mustache; that Durkin told him that there was a "rat" that he brought up from New Mexico and who had tried to steal his clothes but that a man by the name of Ward had stopped him; that on this Sunday evening this "rat" came to Ward's house and asked for somebody; that when he saw him (Durkin) he started to walk away; that Durkin called to him and said he wanted to talk to him, but that he started to run and he was unable to catch him; that he had put on his coat and driven up to the garage, for he was going to see if there was anything wrong with his engine, when all of a sudden a "dick" walked up to him and stuck a gun in his stomach and said: "Hands up; I got you; I got you now; come along; I know all about you; don't make a move or I'll kill you;" that Durkin told witness that he had a lot of money on him and didn't want to get caught, and that he said to the man: "Wait a minute; give me a chance; let me out;" and that as he got out he pulled his gun and struck him with it; that he saw the man fall over, and the latter emptied his gun on him but missed him every shot; that he jumped into the car, backed out of the garage and zigzagged up the street and put the car away; that Durkin also said, "This 'rat' double-crossed me and snitched on me." Cserep also testified that he asked Durkin what he was going to do, and that he replied: "Never mind; I know where to go and where not to go;" that witness asked him if he was not afraid of getting caught, and he replied: "Never mind; I will never give up; I will always shoot it out with the police; I will never be taken; I can shoot too good to be taken;" that he told

witness he could shoot a man at 500 feet, or as far as he could see him, and hit him in any part of the body he wanted to; that witness asked him if he really hurt the . man, and he replied: "Well, I shot him; I don't know he might die, but I had to get away."

Durkin left the city of Chicago. On January 20, 1926, he was arrested in a drawing room of a Chicago-bound train at Webster Grove, a suburb of St. Louis, Missouri. He had a 32-caliber automatic pistol, fully loaded, in his overcoat pocket, with an extra clip of bullets in his vest pocket. A 45-caliber Colt's revolver, loaded, and a cartridge belt containing thirty-five cartridges, were found in his traveling bag in the compartment. He waived extradition and was returned to Chicago. He made a statement to the State's attorney, in the presence of others, admitting the shooting but declared it was in self-defense; that he thought the deceased was a hold-up man; that he had $2200 in his pocket which he intended to use in a "booze deal." The court reporter taking the statement referred to, testified concerning the correctness of portions of it which were offered in rebuttal as impeachment of Durkin.

Plaintiff in error testified admitting the shooting but declared that he was acting in self-defense; that he thought he was being held up; that he did not know that Shanahan was an officer; that he had been for some time engaged in buying and selling second-hand automobiles, and in "bootlegging" as a side line; that he bought the Packard car in good faith from a man by the name of Matthews in Los Angeles and that he had a bill of sale for it; that when he entered Porter Bros.' garage to have some adjustments made on his car the deceased rushed up to him from behind some cars in the garage, thrust a gun in his side and said, "Stick 'em up!" that he raised his hands and turned, and that the deceased, while covering him with one hand, with the other reached for the pocket containing his money; that he turned his body quickly and the deceased fired twice;

330—26

that he thereupon drew his revolver from his pocket and shot twice, and, getting into his car, backed out of the garage; that there was no star or badge displayed by the deceased and that he showed him no warrant for his arrest or in any way indicated that he wanted to place him under arrest, but that witness thought he wanted to rob him. He also testified that he had heard that George was planning to hold him up; that previous to that time George had come to the home of Ward, where witness had left his personal belongings, and tried to steal some of them; that on seeing George that evening he called to him, because he wanted to show him his bill of sale for the car, but that George ran, and witness ran after him from Englewood avenue down to Princeton avenue, where he saw George across the street talking to two or three men, and witness then came back to Ward's house and finished dressing. He also testified that the bill of sale was in his mother's possession at her home. He denied having made the statement to Cserep as to the occurrence, but admitted that he shaved off his mustache, as Cserep testified, in order to conceal his identity, because he didn't want to be arrested before giving himself up, and that he expected to get in touch with an attorney and then surrender himself. He stated that he left Chicago after the killing and went to California and was returning when arrested by the officers.

Counsel for plaintiff in error urge as grounds for reversal of the judgment four points: (1) The trial court erred in admitting evidence of offenses other than the one charged in the indictment; (2) the misconduct of the State's attorney; (3) error in giving and refusing instructions; and (4) that the evidence is not sufficient to show that he is guilty beyond a reasonable doubt.

In support of the first point it is earnestly urged that it was error to admit evidence to show that plaintiff in error was guilty of stealing the Packard automobile in California, and that the State's attorney also sought to show that

he was at the time of the killing wanted on other warrants. After the jury were sworn to try the issues, and before opening statements were made, counsel for plaintiff in error, out of the presence of the jury, requested the court to rule on the matter of permitting proof of other offenses committed by plaintiff in error. The State's attorney stated that it was his purpose to offer to prove that plaintiff in error was the person who stole the Packard automobile, which was in his possession at the time of the homicide, as showing motive for the crime. The court announced it would allow him to show that offense but none other.

Witnesses representing McDonald, the dealer in automobiles in Pasadena, California, testified that the car bearing the motor and serial numbers of the one in possession of plaintiff in error was on the night of September 23 stolen from the McDonald show-room. The skylight had been removed and the lock on the door of the show-room was torn off. In this they were corrobrated by the testimony of Betty Andrews, who also testified that in May, 1925, while on their return from another trip to California, plaintiff in error said to her: "If anybody attempts to stop me, you and Lucile [Durkin's sister] drop to the bottom of the car, and if I cannot talk them out of it I will shoot them out of it;" that Durkin said he couldn't stand for a "pinch." Evidence also complained of was that of James D. Rooney, a special agent of the United States Department of Justice, and of officer Rabbit, who with Shanahan were assigned to arrest Durkin. They testified that they had communicated with Harlow George concerning Marty Westford and the theft of the car. It is also urged that it was error to permit Betty Andrews to state that a fur coat which she had, had been stolen by Durkin and given to her. As to this last objection it is sufficient to say that the evidence was brought out by counsel for plaintiff in error on cross-examination of Betty Andrews.

The rule is that any matter material and competent to prove the issues may be shown. The prohibition is not against evidence of other crimes, but such evidence is not admissible where it does not tend to prove the crime charged. That evidence tends to prove an offense other than the one for which the defendant is being tried is never a valid objection to its admissibility. Proof of other crimes cannot be shown to prove a habit or predisposition of the accused on the ground that such proof would show a probability of the guilt of the defendant of the crime charged. (*People* v. *Rogers,* 324 Ill. 224; *People* v. *Kohn,* 290 id. 410; *Williams* v. *People,* 166 id. 132.) The test of the admissibility of evidence always is the connection of the facts proved with the crime charged and whether it tends to show the, defendant guilty of that crime. If so, it is competent evidence although it tends to show him guilty of other offenses. (*People* v. *Swift,* 319 Ill. 359; *People* v. *Spaulding,* 309 id. 292; *People* v. *Watkins,* 309 id. 318; *People* v. *Horn,* 309 id. 23; *People* v. *Hall,* 308 id. 198; *People* v. *Mandrell,* 306 id. 413; *People* v. *Estes,* 303 id. 602; *People* v. *Cione,* 293 id. 321; *People* v. *Johnson,* 286 id. 108; *People* v. *Duncan,* 261 id. 339; *People* v. *Jennings,* 252 id. 534; *Farris* v. *People,* 129 id. 521; 1 Wigmore on Evidence,—2d ed.—secs. 216-305.) The guilt of a defendant charged with crime cannot be shown by showing that he has committed other offenses, but where the motive for the crime charged is the concealment of some other crime, as killing an officer who is attempting to arrest the offender, the evidence of such previous crime is admissible to show motive. The fact that warrants had been issued for the arrest of the defendant for previous crimes may be shown as affecting the motive for killing an officer attempting to arrest the defendant, but proof of the details of such crimes is improper. (*People* v. *King,* 276 Ill. 138; *People* v. *Spaulding, supra; Moore* v. *United States,* 150 U. S. 74.) Where a deliberate criminal act is established by the evi-

dence the People are not required to prove motive for the
act, (*People* v. *Corder,* 306 Ill. 264,) but the presence of
a motive which would lead the accused to commit the act
charged is always important in the consideration of the
question whether the act done was done with criminal in-
tent.   Motive, therefore, is always a matter of proper proof.
*People* v. *Zammuto,* 280 Ill. 225 ; *People* v. *Watkins, supra.*

In *People* v. *Estes, supra,* the defendant was charged
with assault with intent to murder.   The evidence showed
that the sheriff of the county had received information of
the theft of an automobile and that an attempt would be
made to store it in a certain shed on the night of the offense
charged.   Taking some men with him he went to this shed
on that night.   A car was driven into the shed.   The sheriff
flashed his flashlight into the faces of the defendants and
said, "Hands up !"   One of the defendants, without reply-
ing, drew his gun and fired three shots at the place where
the sheriff was standing when he threw on the flashlight.
It was there said : "It would have been admissible to have
proved that the sheriff had been informed of the fact that
the very automobile already mentioned was stolen on that
evening and that it was expected that the thieves would
drive the car to that shed, and the proof shows, inferen-
tially, that this was the character of the information re-
ceived by the sheriff before he undertook the arrest.   He
had a right to collect a posse on such information and to
go to the shed and see what happened, and to arrest all
persons coming there whose conduct and the possession of
such a car showed that they were the parties suspected and
to arrest them without a warrant before they could get
away.   For them to resist Lansden and to kill him to pre-
vent his arresting them would render them guilty of mur-
der, and that is what they plainly attempted to do.   The
attempted arrest was not unlawful, and their desperate con-
duct when they were faced by the sheriff and Getz with
guns in their hands, to shoot them down and escape, shows

clearly that they were resisting arrest for crime. * * * The bare fact that the sheriff did not make known to Estes the fact that he was an officer does not demand, under the circumstances, that the jury draw the conclusion or presumption that the defendant thought he was resisting a robber or hold-up man in that out-of-the-way shed."

In this case the admission of evidence of the stealing of the automobile was not error, nor was it error to admit the testimony of Rooney, agent for the United States Department of Justice, and of officer Rabbit, as it went to the question of identification of plaintiff in error as one who had a car in his possession which he had stolen, and supported the contention of the State that the deceased was attempting to arrest plaintiff in error. It was proper to show that complaint had been made to the officers and that they were looking for plaintiff in error on that account. (*People* v. *Estes, supra;* I Michie on Homicide, p. 945.) The People's evidence also showed that plaintiff in error knew that George had informed the officers of the theft of the car.

It is also argued that it was error to admit testimony showing that two pistols were taken from the possession of plaintiff in error when he was arrested on the train near St. Louis, for the reason that the arrest occurred three months after the crime, and there was no evidence that either of the guns was used in the shooting. The guns were not introduced in evidence. The testimony of the officer that they were found in Durkin's possession, and also conversations which passed between him and Durkin, were competent as evidence of the details of the arrest.

Counsel also argue that it was error to permit counsel for the People to cross-examine plaintiff in error as to the use of various aliases. He had testified that he had engaged in the buying and selling of used cars, and in the cross-examination which counsel for the People conducted for the purpose of laying the ground for impeachment, he

was asked whether he had sold used cars under the name of Robert B. Hillman, John McGinnis and Harry Jensen. Witnesses were called for the purpose of showing that he had sold used cars under different names. One of these witnesses, Walter M. Schmidt, testified that plaintiff in error resembled the man who sold him a car under the name of McGinnis. Evidence tending to show handwriting to identify the handwriting on the bill of sale as that of plaintiff in error was stricken out. David Berg testified that he traded for a used car with plaintiff in error and received a bill of sale signed "Robert B. Hillman," but he did not testify that plaintiff in error represented himself as being Hillman. The evidence does not have the effect of showing that plaintiff in error was handling stolen cars under assumed names, and while, if it had so shown, its admission would be erroneous, we are of the opinion that no prejudice against him arose by reason of the attempt to make such proof.

It is earnestly urged that improper conduct on the part of the State's attorney deprived plaintiff in error of a fair trial and warrants a reversal of the judgment. Numerous complaints are made of the opening statement by the assistant State's attorney as to what the State would prove. One of these statements was that the State would prove that at the time of the homicide the defendant was a fugitive from justice. This statement was not erroneous, as it was competent to show that fact as affecting his motive and his attitude toward anyone who attempted to arrest him. The statement of the assistant State's attorney that the State would show that a judge of the municipal court of Chicago had issued three warrants for plaintiff in error charging him with an attempt to kill three Chicago police officers was objected to. This objection was sustained by the court. Objections were sustained to other references to offenses aside from the theft of the Packard car. During the arguments to the jury numerous objections were made,

both by counsel for plaintiff in error and for the People, to statements made by the other side. It is unnecessary to set them out in detail. Some of them were erroneous, and were this a case close on the facts, errors of the assistant State's attorney complained of would justify a reversal of the judgment. It is evident, however, from the verdict of the jury, that they were not prejudiced by them. The court sustained objections to those erroneous statements and admonished the jury to pay no heed to them. Most of them arose over counsel's statement as to what was contained in the evidence. The jury, who heard the evidence, were able to tell whether such statements were justified. The case required six weeks in trial. The record is voluminous, the bill of exceptions covering over 1850 pages, and while counsel should avoid making misstatements as to what the evidence showed, it cannot be expected that their memory will always be accurate on that matter.

The next assignment of error is based on the giving, refusal and modifying of instructions. The first instructions complained of are People's instructions numbered 1 and 2. In them the jury were instructed that an arrest may be made by an officer or a private person without a warrant for a criminal offense committed or attempted in his presence, or by an officer when a criminal offense has in fact been committed and he has reasonable ground for believing that the person arrested committed it; also that every male person above the age of eighteen years, when commanded by an officer to assist in arresting an offender, shall obey such command. The basis of the objection to these instructions is, that the deceased, while a special agent of the government, did not, as such, have power to make arrests, and that since the police officers were not present at the time of the actual attempt to arrest plaintiff in error, the deceased could not be said to be a citizen assisting

to arrest an offender, and that he, as a private person, had no right to arrest plaintiff in error without authority from a police officer merely because he saw plaintiff in error in possession of the car. The basis for this last argument is, that it was not shown in the record that plaintiff in error stole the car or had a stolen car in his possession. With this we cannot agree. From the review of the evidence hereinbefore given it sufficiently appears that he did steal the Packard car and had it in his possession at the time he saw the deceased. The record shows that he was at that time resisting arrest for a crime. The deceased had authority to make the arrest. It is not contended that the instructions do not present correct propositions of law. It was not error to give them in this case.

Plaintiff in error also complains of the third instruction, which reads as follows:

"The court instructs the jury that in every case where one person has a lawful right to arrest or restrain another, the person sought to be arrested can have no right to resist, since the two rights cannot co-exist; and where a person thus having the right to arrest another, is killed by the latter in the resistance of such arrest, the resistance is a crime, and the killing is a homicide in the commission of an unlawful act. No right of self-defense can arise out of such circumstances."

It is objected that the instruction assumes that the deceased had a right to arrest plaintiff in error. This is a misconstruction of the charge. It does not assume any fact but states the law. It does not negative the right to resist undue force on the part of the officer making the arrest. This instruction was approved in *State* v. *VanWormer*, 103 Kan. 309, 173 Pac. 1076, *State* v. *Albright*, 144 Mo. 638, 46 S. W. 620, and other cases. (See, also, 13 R. C. L. 867; 66 L. R. A. 356, note.) It was applicable to the State's theory of the case. Defendant's instructions numbered 3, 4, 5, 7 and 9 informed the jury of the right of one

who is assaulted and placed in fear of death or great bodily injury to defend himself. The giving of this instruction was not error.

Instruction numbered 6 is also objected to on the ground it ignores the plea of self-defense. It told the jury, as a matter of law, "that the words 'malice aforethought' do not necessarily imply the lapse of a considerable time between the malicious intent to take life and the actual execution of that intent; whether the design to effect death was formed on the instant or had been previously entertained, is immaterial, for the malicious killing, if proven, by the evidence beyond a reasonable doubt, in either case is murder under the laws of this State." This instruction in self-defense cases has been criticised as ignoring the element of self-defense. (*People* v. *Jarvis,* 306 Ill. 611; *People* v. *Penman,* 271 id. 82.) The jury were fully instructed on the subject of self-defense. The second, third, fourth, fifth, sixth, seventh, eighth, ninth and tenth instructions offered by plaintiff in error instructed the jury on the law and the rights of the defendant under a plea of self-defense. We are of the opinion that it cannot be said that the jury were misled by this instruction. *People* v. *Geary,* 297 Ill. 608; *People* v. *Haensel,* 293 id. 33.

Instruction numbered 14 given on behalf of the People is objected to on the ground that it is not warranted by the evidence. This instruction told the jury, as a matter of law, that a defendant charged with crime cannot avail himself of the claim of necessary self-defense if the necessity for such defense was brought on by his own deliberate and wrongful act. This instruction was condemned in *People* v. *Bradley,* 324 Ill. 294. It was there said that the preponderance of the evidence tended to show that the deceased was the assailant, and the instruction in the form given was calculated to prejudice the defendant. While the instruction was an abstract proposition of law and should not have been given, we are of the opinion that we would

not be justified in reversing this judgment on account of such error. The evidence clearly shows from the testimony of witnesses, the character of bullets used and the direction in which they were fired, that plaintiff in error, and not the deceased, was the assailant.

Instruction numbered 15 is objected to. It told the jury that the law of self-defense did not give to the defendant the right of attack in the first instance or permit retaliation for revenge, and if the jury believed, beyond a reasonable doubt, that the defendant sought or brought on a difficulty with the deceased at the time of the shooting when he had no reasonable or probable cause to apprehend the approach of immediate injustice to himself, and did so from a spirit of utter disregard for human life or from a motive of revenge or retaliation, then the defendant cannot avail himself of the law of self-defense and cannot be acquitted on that ground. The evidence shows that plaintiff in error fired the shots which killed the deceased while the latter was attempting to arrest him; that he was armed with a revolver and had made threats to "shoot it out" with any policeman who might try to apprehend him. The instruction was not erroneous.

The modification of certain instructions is also assigned as error. We have examined these instructions and are of the opinion that the objections are not well founded.

The refusal of defendant's fourth refused instruction is complained of. It told the jury that "it is not sufficient to constitute the intent to murder that the party charged intended at the instance of the assault to kill the party assaulted. One may in self-defense intentionally kill another and not be guilty of murder. The intent to kill may not be an intent to commit murder but to take the life of another in self-defense or upon that sudden heat of passion which reduced the crime of killing to manslaughter. If the jury believe, after taking in consideration all the testimony in the case, that the defendant in this case acted under the

honest belief that the deceased was about to do great bodily harm or take his life, or if the jury have a reasonable doubt as to just how the killing took place, it is their duty to return a verdict of not guilty." This instruction was properly refused, as it involved the crime of manslaughter. Such an issue was not involved in this case. No evidence was offered on either side that could be said to form the basis for a manslaughter verdict. (*People* v. *Bradley, supra; People* v. *Davis,* 300 Ill. 226.) The instructions are to be considered as a series, and we are of the opinion, upon a consideration of all the instructions given, that plaintiff in error was not prejudiced thereby but that the jury were fully instructed both as to the law and its application to the evidence.

The last ground of reversal urged is that plaintiff in error was not proven guilty beyond a reasonable doubt. We have reviewed in this opinion the principal part of the evidence. From an examination of the entire record we are of the opinion that the jury were fully justified in their verdict. Both the testimony of witnesses and the physical facts surrounding the shooting show plaintiff in error to have been the first to shoot. His own statement on that night after the crime shows that he knew he was about to be arrested. His statement made before the State's attorney as to what occurred varies sharply from his testimony on the witness stand, and in other particulars his evidence was shown to be contradictory and improbable. The record contains errors of minor importance, but it cannot be said that the jury might have arrived at another verdict had such errors not been committed. We are of the opinion, therefore, that we would not be justified in returning this case for another trial.

The judgment of the criminal court is therefore affirmed.

*Judgment affirmed.*