(No. 14148.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JIM DAVIS, Plaintiff in Error.

*Opinion filed December 22, 1921.*

1. CRIMINAL LAW—*when lengthy cautionary instruction is not erroneous.* The giving of an unduly long instruction in a murder trial for the purpose of assuring the jury of the impartiality of the court and to caution them against allowing the conduct of the court or counsel to influence their verdict is not necessarily prejudicial error, and in the absence of anything in the bill of exceptions to the contrary it will be presumed there was a basis for the instruction.

2. SAME—*instruction as to voluntary manslaughter is not applicable to plea of self-defense.* An instruction quoting section 144 of the Criminal Code, as to voluntary manslaughter being the result of a sudden, irresistible impulse, has no application to a plea of self-defense in a murder trial, as a man may deliberately and intentionally use a deadly weapon in self-defense and may intend to kill his opponent and yet not be guilty of either murder or manslaughter.

3. SAME—*when instruction directing verdict of guilty is erroneous.* While every fact is not required to be proved beyond a reasonable doubt to authorize a verdict of guilty, certain facts must be so proved; and it is not proper for an instruction in a murder

trial, after advising the jury that every fact need not be proved beyond a reasonable doubt, to direct a verdict of guilty if the jury believe, from the whole evidence, that the defendant is guilty, without informing them what facts must be proved beyond a reasonable doubt to authorize such a verdict, especially where the instruction ignores the defendant's claim of self-defense.

4. SAME—*instruction as to right of self-defense should not require "well grounded" belief in danger.* The belief in the danger of death or great bodily harm which will justify the exercise of the right of self-defense is no more than a reasonable belief in view of the facts apparent to the assaulted party, and in a murder trial an instruction which requires, in addition to such reasonable belief, a "well grounded" belief in the danger is misleading and erroneous. (*Campbell* v. *People,* 16 Ill. 17, commented on.)

5. SAME—*instructions should not be long and argumentative.* Instructions should briefly, clearly and distinctly state to the jury the rules of law which they should use in the determination of the case and without argument apply them to the facts which the jury may find from the evidence, and not every statement which may properly be used in the argument to the jury is proper to be given in an instruction.

WRIT OF ERROR to the Circuit Court of Williamson county; the Hon. D. T. HARTWELL, Judge, presiding.

GEORGE B. WHITE, D. L. DUTY, and J. L. FOWLER, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, and FLOYD E. BRITTON, (JOHN M. REID, GEORGE W. PILLOW, and O. C. SMITH, of counsel,) for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

Jim Davis prosecutes this writ of error to reverse a judgment of the circuit court of Williamson county convicting him of manslaughter on an indictment charging him with the murder of Stanley Pemberton.

Broadway, the main street of Johnston City, runs east and west and crosses at right angles the Chicago and Eastern Illinois railroad. The homicide occurred about one block east of the crossing at a few minutes after eight

o'clock in the evening of Monday, June 29, 1920. On the south side of the street, from west to east, this block is occupied first by a moving picture theater, next a confectionery store called a "Candy Kitchen," then the Stirtiz hardware store, the Manhattan Cafe, the Jones drug store, in that order, and the Henson grocery store on the corner at the east. Bricks were piled up along the side of the street in preparation for paving. Stanley Pemberton was a young man twenty-four years old, five feet nine inches tall, weighing about one hundred and sixty-five pounds. He had been married about six weeks. The plaintiff in error was thirty-six years old, weighing about one hundred and fifty pounds. On Sunday evening, June 28, Pemberton's wife, who was twenty-three years old, was in the Manhattan Cafe, seated at the lunch counter, talking with Midge Harris, who is a step-daughter of the plaintiff in error, employed in the cafe and was behind the counter. Davis was also in the cafe. He was eating at the counter or was in the back part of the room getting a drink of water. Davis and Pemberton were not acquainted. Pemberton came in and said to Davis, "What are you doing talking to my wife?" and Davis answered, "I wasn't talking to your wife." Pemberton said, "If you was, I don't want to catch you talking to her again." Pemberton then went out and Davis saw him no more until the next night immediately before the homicide. The evening of the next day Mrs. Pemberton went to West Frankfort with Ruth Harris, another step-daughter of Davis, on the train leaving Johnston City about six o'clock and returned on the train arriving between seven and eight. Her husband had not been at home the night before and she had not seen him since he was in the cafe, but he met her at the station upon her return from West Frankfort and the two walked east on Broadway. Near the confectionery he said, "Wait a minute," and walked on east while his wife stopped. Pemberton asked Louis Griffith, who was standing near, "Have you seen Jim Davis?"

and then said, "I see him now." Davis was standing in front of the cafe or drug store engaged in conversation with several men. Pemberton touched him on the shoulder with a paper which he was carrying and said, "I want to speak to you a minute." Davis turned and the two walked to where Mrs. Pemberton was standing in front of the hardware store. Pemberton asked Davis if Mrs. Pemberton had gone to West Frankfort with Davis and Davis' two step-daughters. Davis made no reply. Mrs. Pemberton testified that he made a motion toward his bosom, and thereupon Pemberton shoved her aside and two shots were fired while the men were there on the sidewalk. The evidence in regard to the firing of the shots is contradictory. Pemberton struck or pushed Davis, and the latter was knocked or stepped back off the sidewalk and then ran backward northeast across the street. Pemberton followed him up closely and was either striking at him or grabbing at him until they were a few feet from the curb on the north side of the street, where they clinched and fell into a mudhole six or eight inches deep. Pemberton was on top of Davis, shots were fired and Davis got up and walked away. Pemberton had received four or five shots in the body and died in a few minutes. One of the shots struck Davis in the left arm.

The serious conflict in the evidence is in regard to when the shooting began. A number of people were on the street within a short distance and more than a dozen of them testified to the occurrence. Mrs. Pemberton testified, as has been stated, that the first two shots were fired while the men were on the sidewalk. Griffith testified that the first two shots were fired after Davis had backed away ten feet; the second two shots after the men had gone about ten feet further, at the place where they fell and while they were standing; and the fifth after they had fallen. Moses Thornton testified that the first two shots were fired while the men were on the sidewalk.

For the purpose of laying a foundation for their impeachment, Mrs. Pemberton and Louis Griffith were asked, on cross-examination, in regard to their testimony in a *habeas corpus* proceeding for the purpose of procuring Davis' admission to bail, and in rebuttal W. O. Potter, judge of the city court of Marion, who presided at that hearing, stated that they testified that the first shots were fired after the two men had left the sidewalk and had fallen in the street. The other eye-witnesses of the occurrence, the five men who were talking with Davis when Pemberton called him aside, a traveling salesman who was sitting on a brick pile about sixty or seventy-five feet away from the scene, and several others who were at various distances from fifteen to fifty or seventy-five feet, as well as Davis himself, all testified that no shot was fired until after the two men had fallen in the mudhole. Griffith and Thornton testified that the first motion that was made was by Davis reaching for his pistol, whereupon Pemberton pushed his wife aside and struck or pushed Davis. Several of the other witnesses testified that Pemberton hit Davis in the face with his right hand while Davis was doing nothing and knocked Davis' hat off, and Davis started to run across the street with Pemberton after him. Davis said that Pemberton struck him over the left ear and the blow addled him and knocked him off his feet and his hat flew off; that immediately after the blow was struck he started across the street, going north, and Pemberton was coming toward him and overtook him about two-thirds of the way across. Pemberton threw him down and he fell on the ground in a mudhole with Pemberton on top of him, and then he took his pistol out and shot. Mrs. Pemberton testified in regard to the meeting Sunday evening that Davis said after Pemberton went out of the cafe: "That man don't want to mess with me; he is too much of a man for me but I generally carry the difference." There was evidence of some other circumstances of minor importance, but what has been said is sufficient

to indicate the contradictory nature of the testimony and the necessity for the careful avoidance of error on the trial.

On Davis' cross-examination the following questions were asked and answers given:

Q. "Were you ever in business just beyond the corporate limits, [referring to Johnston City,] to the northwest?

A. "I wasn't in business.

Q. "Do you know a place run by Dan Ashby, west of Johnston City?

A. "No, sir; I don't."

Counsel say that these questions could have had no other object than to prejudice the jury against the defendant, and they state in their brief the character of Dan Ashby's place, which was well known to the court and the bar. Nothing of the kind appears in the record, and, of course, we can not take judicial notice of the character of individuals or their business. The questions appear to have had no relation to the case, but the record contains nothing from which it can be inferred that the making of them could have prejudiced the defendant.

So far as the law was concerned, this was a simple case involving no complex legal principles. The occurrence was a street fight lasting but a few minutes, in which a man killed another, and the defense was self-defense. As was said in the case of *Gilmore* v. *People,* 124 Ill. 380, the principles of law applicable to the facts are very few and might have been stated in a few concise and clearly expressed propositions. More instructions were given for each side than the nature of the case justified, and the effect was to confuse rather than enlighten the jury. The court gave twenty-nine instructions for the People and twenty-two for the defense, occupying fifty-five pages of the abstract,— probably fifteen thousand words. The first instruction is a cautionary instruction, intended to advise the jury, among other things, that the jurors were judges of the law as well as the facts; that the action of the court in preserving or-

der, suppressing manifestations of approval or disapproval, sustaining or overruling objections to evidence, should not be regarded as indicating sympathy with either side or any opinion as to the weight or credit of any evidence. The instruction is objected to for the reason that it draws the attention of the jury to the case as one of unusual importance and to the demonstrations occurring during the trial, though the record does not show that any demonstrations did occur. In the absence of any statement in the bill of exceptions it will be presumed there was a basis for the instruction. Its object was, among other things, to assure the jury of the impartiality of the court. While it covers nearly three pages of the abstract and was unduly prolix it was not otherwise erroneous.

Many of the instructions are objected to. Instruction No. 11 is section 144 of the Criminal Code, as follows:

"In cases of voluntary manslaughter there must be a serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person, or an attempt by the person killed to commit a serious personal injury upon the person killing. The killing must be the result of that sudden, violent impulse of passion supposed to be irresistible; for if there should appear to have been an interval between the assault or provocation given and the killing sufficient for the voice of reason and humanity to be heard, the killing shall be attributed to deliberate revenge and punished as murder."

This section refers only to cases of voluntary manslaughter, where the killing is the result of a sudden impulse of passion supposed to be irresistible. It has no application to a plea of self-defense. It states that the killing must be the result of that sudden, violent impulse of passion supposed to be irresistible. It substantially eliminates the question of deliberation and intention, and yet those elements are present in self-defense and are no impediments to the defense. A man may deliberately and in-

tentionally use a deadly weapon in self-defense, and he may intend to kill his opponent, and yet not be guilty of either murder or manslaughter. *Friederich* v. *People,* 147 Ill. 310; *Hammond* v. *People,* 199 id. 173; *People* v. *Penman,* 271 id. 82.

Instruction No. 13 begins with the statement, "Justifiable homicide is the killing of a human being in necessary or apparently necessary self-defense," and continues in the language of section 148 of the Criminal Code, in regard to the defense of habitation, etc. Except the part which is above quoted the section had no application to the case, and the instruction referring to cases of other kinds should not have been given.

Instruction No. 16 stated that "while the law requires the prosecution to prove to the satisfaction of the jury all of the material allegations of the indictment before conviction can be had, yet the law does not require the prosecution to prove every fact in issue beyond a reasonable doubt, and in this case after summing up all the evidence in the case, if you believe from the whole evidence beyond a reasonable doubt that the defendant is guilty as charged in the indictment, you should so find by your verdict." As far as the instruction advised the jury that it was not necessary that every fact should have been proved beyond a reasonable doubt, and that the reasonable doubt to justify an acquittal must be as to the guilt of the accused on the whole of the evidence and not as to any particular fact, the instruction stated the correct rule of law; (*Weaver* v. *People,* 132 Ill. 536;) but there ought not to have been added to the conclusion the words, "if you believe from the whole evidence beyond a reasonable doubt that the defendant is guilty as charged in the indictment, you should so find by your verdict." This part of the instruction stated no rule of law but directed a verdict of guilty if the jury believed the defendant was guilty, without requiring the finding of any fact and without giving any rule by which they were to

be guided in arriving at the conclusion of his guilt. While every fact is not required to be proved beyond a reasonable doubt, certain facts must be so proved, and it is not proper, after advising the jury that every fact need not be proved beyond a reasonable doubt, to direct a verdict of guilty if the jury believe, from the whole evidence, that the defendant is guilty, without informing them what facts must be proved beyond a reasonable doubt to authorize a verdict of guilty. The instruction to find the defendant guilty if the jury believe that he is guilty "as charged in the indictment" entirely ignored the defendant's claim of self-defense. The instruction as given was erroneous.

Instruction No. 20 is as follows:

"You are further instructed, that before a person will be justified, under the law of self-defense, in shooting and killing another, it is not enough that he is under a reasonable apprehension of danger; he must at the time have not only a reasonable, but a well grounded belief, from the surrounding circumstances, that he is in danger, real or apparent, of losing his life, or receiving great bodily harm. The jury must determine from the evidence in the case, whether the circumstances surrounding the homicide were such as to induce the belief in a reasonable mind, that the shooting of Pemberton by Davis was necessary, or apparently necessary, to save his own life, or to prevent his receiving great bodily harm. If the shooting and killing of Pemberton was not necessary, and was not apparently necessary for Davis to save himself from death or great bodily harm at Pemberton's hands and so shown by the evidence to your satisfaction beyond a reasonable doubt, the killing would be deemed unlawful."

This instruction is erroneous in requiring of the defendant who justifies a homicide on the ground of self-defense a stricter proof as to his apprehension of danger than the law requires. He must have, according to the instruction, not only a reasonable but a well grounded belief from the

surrounding circumstances that he is in danger of losing his life or receiving great bodily harm. In many cases, beginning with *Campbell* v. *People,* 16 Ill. 17, it has been held that it is not necessary to a plea of self-defense that the accused should have been in actual danger, but that it is sufficient that the accused reasonably believed that he was in danger of losing his life or suffering great bodily harm. It is true that in the *Campbell case,* and in many of those which have followed, the statement is made, substantially, that if the defendant was assaulted in such a way as to induce in him a reasonable and well grounded belief that he was in danger he would be justified, but in no case has it been held that an instruction has been proper which required more than a reasonable belief in the danger. In cases in which the expression "reasonable and well grounded" has been used, the language is that of the writer of the opinion in discussing the general principles of the law of self-defense and is not that of any instruction being considered. It means no more than a belief, reasonable in view of the facts apparent to the accused. In these cases it is said that men when threatened with danger are obliged to judge from appearances, and that if they act from real and honest convictions induced by reasonable evidence they cannot be held responsible, criminally, for a mistake in the extent of the actual danger, where other reasonable and judicious men would have been alike mistaken. This requires no more than a reasonable belief. To require, in addition to this, a well grounded belief is to require actual danger. "Well grounded" is intended to mean more than "reasonable." The belief, according to the instruction, must be not only reasonable but well grounded, and well grounded means thoroughly or satisfactorily established or resting upon a solid foundation. The object of instructing the jury is to inform them as to the law. When they are told that a reasonable apprehension of danger is sufficient to justify a defendant in the exercise of the right of self-defense

that conveys a distinct idea. When they are told that it is not enough that the apprehension of danger be reasonable, but the accused must, in addition to that, have a well grounded belief that he is in danger, that conveys another distinct idea,—that the belief must be reasonable and founded in fact. Such an instruction is misleading and erroneous and ought not to be given.

Instructions Nos. 22 and 23 were as follows:

22. "The court informs you that it is not every case where a person is attacked that he has a right to draw a pistol and shoot the one attacking him. It is not every case where one is struck by another and then immediately attacked that gives the one attacked and struck the right to draw a pistol and shoot the one who struck the blow and made the attack. There are cases where the one struck and attacked may shoot and kill the assailant and some where the law will not justify the shooting.

"If you believe from the evidence in this case beyond a reasonable doubt that Stanley Pemberton was not armed and that the defendant Jim Davis was armed with a pistol, and if you further believe from the evidence beyond a reasonable doubt that Jim Davis first drew a pistol under circumstances that would lead a reasonable person, situated as Pemberton was situated, to reasonably and in good faith to believe that Davis was trying to shoot him, and if you also believe from the evidence beyond a reasonable doubt that Pemberton was not doing anything toward Davis that would lead a reasonable person, situated as Davis was situated, to believe in good faith that he was about to be killed or seriously injured by Pemberton, then and under such circumstances if such circumstances are shown by the evidence beyond a reasonable doubt, Pemberton had the right to do any and all things necessary or apparently necessary to keep Davis from shooting him and to wrest the pistol from Davis and to follow him up for that purpose, and if the evidence does show to your satisfaction beyond a rea-

sonable doubt that Davis did bring on and provoke the difficulty and drew his pistol with the manifest intention to shoot Pemberton at a time when Pemberton was doing nothing toward Davis, as explained in this instruction, then in such case even if Pemberton did then try to strike Davis or assault Davis, or try to dispossess Davis from the pistol, Davis could not legally be given the benefit of the law of self-defense unless Davis first in good faith declined the combat before the fatal shot was fired—the law being that one cannot provoke and bring on a difficulty and induce another to assault him and then be given the right of self-defense on the ground of being in danger of death or great bodily harm, unless the one first bringing on the difficulty in good faith declines further combat, before the fatal shot or shots are fired.

23. "Even though Davis did not bring on the difficulty and even if he did not commit the first assault, and even if Pemberton committed the first assault, and even if Pemberton committed an assault upon Davis, under such circumstances Davis would have the right to defend himself, yet, the court further instructs you that a person does not always have the right to use a pistol and shoot and kill another even though he does have the right to defend himself. In other words, the right of self-defense does not always extend to the right to use a pistol. It may or not extend that far.

"In this case even if you believe from the evidence that Pemberton committed the first assault and struck Davis a blow and inflicted upon Davis a serious and highly provokable injury that was sufficient to arouse an irresistible passion in Davis acting as a reasonable person would have. If you further believe from the evidence, beyond a reasonable doubt, that Pemberton thereafter followed up Davis and attempted to whip him, and if you further believe from the evidence beyond a reasonable doubt that Davis was not in danger, real or apparent, of losing his life, or re-

ceiving great bodily harm at the hands of Pemberton and that the killing was not in self-defense, then Davis would not be guilty of murder under the above circumstances, he would be guilty of manslaughter."

The opening paragraph of each of these instructions makes no statement of law applicable to the case. They are merely argumentative introductions to the long, involved, obscure instructions which follow. The principles involved in them could have been stated in a dozen lines. Instructions should briefly, clearly and distinctly state to the jury the rules of law which they should use in the determination of the case and without argument apply them to the facts which the jury may find from the evidence. These instructions are like the instructions of which it is said in the case of *Morello* v. *People,* 226 Ill. 388, that they "do not meet with the unqualified approval of this court even when the language is accurate. They are apt to be found persuasive by a jury. In the instruction the first three of the numbered propositions as above set out are ones about which there is little or no controversy; the fourth is seriously controverted, and the fifth is crucial. The manifest purpose of so drawing an instruction is to lead the jury, by a progressive process, to assent to a proposition from which conviction follows. It is unlike an instruction which states to a jury, for their determination, several material propositions which are really controverted." These instructions would have been appropriate enough for the State's attorney to use in addressing the jury, but they were too argumentative to be given as a statement of the law which should govern them in deciding the case. Every statement which may be used in an argument to a jury is not necessarily proper to be given to the jury as an instruction.

The judgment will be reversed and the cause will be remanded.                    *Reversed and remanded.*