THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ALFRED BRADLEY, Plaintiff in Error.

*Opinion filed February 16, 1927.*

1. CRIMINAL LAW—*when instruction as to manslaughter is erroneous—self-defense.* In a prosecution for murder, where the only defense set up is self-defense, an instruction as to manslaughter is erroneous which infers that any killing would be murder if the person killing acted premeditatedly or intended to kill the other a sufficient length of time before the killing to restrain or control his impulses, as a person may in self-defense intend to kill his opponent without thereby being guilty of either murder or manslaughter.

2. SAME—*when an instruction is erroneous as not referring to evidence.* In a prosecution for murder, where the evidence, although not conclusive on the question, preponderates in favor of the conclusion that the deceased was the assailant, it is error to give an instruction stating the abstract proposition that the defendant cannot avail himself of the defense of self-defense if the necessity for the killing was brought on by his own wrongful act, without requiring such finding under the evidence.

3. SAME—*when instruction defining malice should not ignore self-defense.* In a prosecution for murder, where the only defense set up is self-defense, it is error to give an instruction defining malice and completely ignoring the defense, especially where the instruction contains a citation of a decision of the Supreme Court, which was read to the jury and in which no question of self-defense was involved.

4. SAME—*when conviction will be reversed for erroneous instructions.* A reviewing court will not reverse a judgment of conviction simply because the evidence is conflicting, but where such is the condition of the evidence it is necessary that the jury be accurately instructed, and if the reviewing court is of opinion some of the instructions were erroneous and prejudicial to the defendant the judgment will be reversed.

5. SAME—*when erroneous instructions are not cured by others.* Instructions are to be considered as a series, but in a prosecution for murder, where the only defense set up is self-defense, error in giving the jury instructions as to manslaughter and malice which completely ignore the defense cannot be cured by the giving of other instructions which are correct.

WRIT OF ERROR to the Circuit Court of Menard county; the Hon. FRED G. WOLFE, Judge, presiding.

ARTHUR W. LILIENSTEIN, and EDWARD H. GOLDEN, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, EDWARD G. KING, State's Attorney, and VIRGIL L. BLANDING, (JOHN M. SMOOT, of counsel,) for the People.

Mr. JUSTICE FARMER delivered the opinion of the court:

Alfred Bradley, who will hereafter be called defendant, was convicted in the circuit court of Menard county under an indictment charging him with the murder of John W. Tice in Menard county January 31, 1926, by striking and cutting him with a knife. Motions for a new trial and in arrest of judgment were overruled by the court and he was sentenced to imprisonment in the penitentiary for a term of twenty-five years. He has sued out this writ of error to review the judgment.

Defendant was between eighteen and nineteen years old at the time of the homicide and deceased was twenty or twenty-one years old. Their respective parents were near neighbors, those of deceased living about 200 feet northwest of the depot of a small village called Tice Station. Defendant's parents lived within about an eighth of a mile of deceased's parents. The station is on the south side of the railroad track, which runs east and west at that point. The depot is a little red shanty and the platform between it and the railroad is a cinder platform. Defendant and deceased had previous to the time of the homicide had combats, and when they met on the platform of the station, which was about ten o'clock in the forenoon, a fight occurred between them, during which defendant struck deceased three times with a knife, one of the wounds penetrating his heart, from which wound he died. The defense

interposed by defendant was that he killed deceased in self-defense.

It is earnestly contended by defendant that the evidence is wholly insufficient to sustain the verdict and judgment, and that the court erred in its rulings in giving and refusing instructions.

The principal part of defendant's brief and argument is devoted to the evidence, as is also the brief and argument for the People. There were at the depot at the time of the encounter between the defendant and deceased, besides the principals, Claud Bradley, father of defendant, Thomas Stott and Lawrence Turner. There is no evidence that the meeting of the two principals at the station was expected or designed by either. Deceased had been to the station some time before but had gone away to drive his father's cows to pasture, and after he left defendant came to the station, but he did not know, so far as the evidence shows, deceased had been there or that he intended to return.

Lawrence Turner testified he lived near the station and went to the depot in the neighborhood of eleven o'clock. The train was due to arrive there about eleven. When it came in witness was at the southwest corner of the depot but not on the platform. He saw deceased, defendant, defendant's father and Stott on the platform. When he saw defendant he was near the end of the depot, coming from the east. Deceased came from the east down the railroad. The witness testified the first word he heard was defendant saying, "Don't you remember the other day?" and deceased said he did. Defendant said he wanted to have it out with him, and deceased said, "This is as good a place as any." Then they got to knocking, but he could not tell who struck the first or the second blow. The train was coming in from the west and defendant's father parted the boys, taking hold of each of them, and held them apart. Deceased's sister, Mrs. Riber, and her husband, came on the train. When they alighted and came up, the train had

moved past and defendant was standing between the rails. Deceased fell, but witness did not know when he fell. Witness saw no knife. He did not know deceased was dead when they picked him up. Witness said each combatant struck blows at the other, but he didn't know which one struck the first blow. When defendant's father separated them he told deceased to go home and he would make defendant go home. After they were separated by defendant's father witness never saw either one strike a blow. Witness did not know whether he heard the first words between them or not. He was twelve or fourteen feet from them at the time they met.

Thomas Stott, who was present when the altercation occurred, testified he was standing at the northwest corner of the depot and Turner was at the southwest corner. Claud Bradley, defendant's father, was standing a little northwest from them and defendant was standing right north of them. When deceased came up to the station the train was approaching and was about half a quarter of a mile away. The first he saw of deceased and defendant they were arguing. Defendant said, "You and Turner jumped on me yesterday; you can't whip me by myself." Deceased said he didn't need any help and pulled off his coat. The train had not yet pulled in but was getting very close. The next thing he saw after deceased pulled off his coat they were fighting, but he could not say who struck first. He saw nothing in the hands of either of them. They were striking with their fists. Defendant's father separated them. He had deceased with his right hand and defendant with his left. Their backs were toward the train that had just then pulled in. Defendant's father was holding them out at arm's length. They were pretty close to the train. Defendant's father told defendant to go home and told deceased to go home. The train was then in. Witness saw Mrs. Riber and husband get off the train. After he looked

to see who got off he saw deceased and Claud Bradley standing about where the fight had started and defendant was up the track. Deceased turned around and fell. Riber picked him up. Defendant came down and offered to help pick him up, and then defendant's father came up. Witness did not pretend that he heard all of the conversation which passed between deceased and defendant. He saw deceased pull off his coat and the next he saw they were fighting, both striking. It lasted but a few seconds. Defendant was backing up. When the fight started deceased was facing the west, from where the train was coming, and defendant was facing the east. During the fight they got turned and defendant was backing toward the train. He could not have been very far from the edge of the platform when defendant's father separated them. When defendant's father told him to go home defendant started to go east along the side of the track. He never saw the combatants come together again after they were separated.

Hazel Riber, a sister of deceased, arrived at Tice Station on the train. She testified when the train pulled in she saw deceased, defendant and his father standing pretty close together on the platform. It looked like there was some trouble. She saw them out of the window. She thought they were both jumping on deceased. She alighted about two rail lengths from them and called, "Hello, John!" He looked at her and smiled. Defendant's father had hold of his left arm. Just as witness called to her brother defendant rushed to him and struck him in the left side with his fist. Immediately deceased's face became colorless and his head drooped. She ran up to where they were, put her hand on deceased's shoulder and told defendant's father he was a dirty big thing to hold him while someone hit him. Her husband came up and asked what was the trouble. Deceased just stood there. When defendant's father turned him loose he took two or three steps and fell on his face. Witness testified she heard defendant say, "Well, Dad, I

got him, and if I don't get away from here they will get me." His father replied, "Yes, you got him, but go home and wait for me." On cross-examination witness testified that after defendant stabbed her brother he just stood there and looked. He didn't go on the railroad track. When defendant spoke to his father after deceased had fallen he was still in the same position, only a little farther to the north. She testified she was a witness at the coroner's inquest but could not say what she testified to. She was nervous, excited and grief-stricken.

Mrs. Riber testified before Stott was called by the People. He was asked if he saw the combatants come together again after the defendant's father separated them, and answered he did not. He never saw defendant strike or move to strike deceased just after they were separated. He further testified defendant did not return and make a thrust with a knife but must have been twenty-five feet away when deceased fell. He testified he saw Mrs. Riber come up to where deceased and Claud Bradley were standing. He believed she was there when deceased fell. Defendant was fifteen or twenty feet east of them, but after deceased fell defendant came back and offered to help. Witness further testified he was pretty close to the parties after the fight, and he didn't hear defendant say, "Well, Dad, I got him, and if I don't get away from here they will get me," and didn't hear his father say, "Yes, you got him, but go home and wait until I get home." He said he didn't think any such words were uttered.

The coroner, who was a physician, testified there were three wounds on deceased's body: one about the center of the arm, about one and one-half inches long, on the right side, extending upward and inward; one under the left shoulder blade, extending inward, toward the backbone; and one between the fourth and fifth ribs, penetrating the heart. It was two and a half inches long and between two and a half and three inches in depth. He testified a per-

son would live a very short time after receiving that blow; that it would be a matter of seconds.

The sheriff of Menard county, George P. Clary, was called as a witness by the People and testified he went to the home of defendant's father the day of the homicide, and, besides the father, defendant and his mother were there. Defendant's father gave him the knife used on deceased, which he said was in the same condition that it was when he received it, and it was offered in evidence. He testified he opened it several times; that it was hard to open; that that night at the jail he asked defendant if he knew Tice was dead, and he said he did. He said deceased had called him a vile name, stating what it was, which is too loathsome and disgusting to print. Defendant said he could not stand it.

Edward Beard testified he was in jail when defendant was taken there and had a talk with him. Witness said he asked him if Tice was dead, and defendant said he was. Witness asked defendant what the trouble was over, and he said Tice called him the vile name we have referred to, and that it was more than he could stand; that he asked Tice if he was going to take it back, and he said the fight started from there and that he was here to defend himself.

Thomas Parks testified he lived near defendant and they visited back and forth; that he had seen the knife that was used, in the possession of defendant. He was half-soling his boots with it. He never saw him sharpen it. That was about two weeks before the homicide. Witness' wife, Blanche Parks, testified she had seen the knife in defendant's possession. She borrowed it to sharpen a pencil, but could not open it and asked defendant to open it for her.

There was some other testimony for the People, but we do not understand it to throw any special light upon how the homicide occurred.

For the defendant, his father testified his house is in the neighborhood of 400 feet from the depot,—a little red

shanty, with a cinder platform between it and the track. He went to the depot about ten o'clock. Stott, Turner, Faith and deceased were there. After he arrived deceased went to drive his father's cows to pasture or water and was gone fifteen or twenty minutes. Defendant was at witness' home when he left there but came over to the depot after deceased had left it. Witness was standing on the platform, which runs east and west alongside the track, just a little past the west end of the depot. Defendant was standing near and north of Stott on the platform and "we were talking." Shortly after defendant came to the depot witness saw deceased coming up the track. When he came to the depot he walked right up the track until he got within about ten feet of defendant, when he stepped on the platform and walked as if he was going to butt into defendant. Defendant said he wanted no trouble, and threw his arm up as if to shield his face. Witness could not recall what the parties said, but deceased jerked defendant's arm down, jumped back and threw off his coat. He threw it over in the depot and then came back and hit defendant on the shoulder. Witness could not exactly tell what happened next, because the train was coming and was not far from the depot. He saw the defendant going backwards, and jumped in, grabbed both boys and separated them. Defendant was backing toward the track, and the train was not far from the place where they were, moving toward them. He thought defendant was not more than a foot from the engine as it passed by. He was facing east and deceased was facing west. The train was approaching from the west. Witness saw but one lick struck, and that was by deceased. It looked like deceased was pushing defendant backwards nine or ten feet. Witness grabbed both of them, deceased with his right hand and defendant with his left. They were going toward the train, and he whirled them around and changed places with them, so that defendant was facing west and deceased east. He told deceased to

go home and he would make defendant go home. Mrs. Riber alighted from the train, came back to where the parties were and wanted to know what witness was doing. He told her he was separating the boys; that they had been fighting. There were no blows struck after witness got hold of the boys. Mrs. Riber asked why witness was holding her brother, and he let loose of him. Deceased took a step or two east and fell. Defendant was thirty feet or more up the track. He came back after deceased fell and tried to help him up. Riber, witness thought, and deceased's father, took him home. Witness went home with defendant. Defendant did not say, "Well, I got him, Dad, and if I don't get away from here they will get me." Witness testified he did not say, "Yes, you got him, but go home and wait until I come." On the way home witness asked his son what he had done, and the son said that he struck deceased with a knife. Witness took the knife from him and kept it until the sheriff came. He identified the knife as the one in evidence. He testified defendant got the knife from one of Harry Clark's boys, who left it in the house when they moved away. He went over to deceased's home to see if there was anything he could do to help him. He ran to a neighbor's for a hot water bottle and stayed at deceased's home until they said he was dead. The Sunday before the homicide he saw defendant half-soling his shoes and using the knife. In the scuffle the combatants were going toward the train, defendant with his back in the direction from which the train was coming. He grabbed them in order to prevent them getting in the way of the train. It looked as if deceased was going to push defendant into the train. Deceased had hold of defendant's shoulder when they were going back. He did not know that defendant was hitting deceased while that was going on. It was all done in a few seconds. The engine had barely passed when he took hold of the combatants to separate them. It was less than half a quarter

away when deceased threw off his coat. When the train approached closer he felt the vibration of the earth, stepped to where the combatants were, and separated them. Up to. the time he felt the ground quiver he did not see defendant strike deceased. As he turned them around, reversing their positions, deceased was west of him and defendant east. As he turned them around the engine went by. Defendant did not go in behind witness after witness separated and pushed them away. Defendant never got behind witness. Witness never knew a knife was used until it was over and he and defendant went up the track.

Defendant testified in his own behalf that he was nineteen years old in June, 1926, and lived with his father and mother. His father is Claud Bradley, who testified as a witness. He had known deceased four or five years. He had trouble with him about a year before the homicide. Deceased at that time stepped out of the depot and grabbed defendant. He said defendant accused him of stealing tires from Tom Parks. He denied it and offered to go with deceased to Parks and prove that he didn't do it. Deceased jumped on him and gave him a beating, striking him in the ribs and over the head. Defendant said he didn't fight back but just stood there, covered up his face to protect it and then went home. Defendant broke his arm in the spring of 1925. About a week afterwards, while his arm was in a sling, deceased accosted him and wanted to know why defendant had been telling lies on him. Defendant said he had not. Deceased told defendant he lied and struck him in the mouth and then walked off. Defendant didn't do anything. At another time defendant was hauling water for Henry Faith at threshing time. Deceased met defendant and called him names. Defendant said he didn't want any trouble. Deceased struck him on the head and face. Defendant didn't fight back. At another time when defendant was walking in the road he met deceased, who was in a car. Deceased jumped out of the car and

struck defendant in the head and on the ear. Defendant did not strike back at him. At another time deceased tried to run over him with a car. Defendant was walking in the road and jumped out of the way, and deceased didn't stop. Defendant testified that about a week before the homicide he was down at the "red shanty," a little frame building on his father's property, across from the depot. Charles Turner and deceased came over to where defendant was and wanted to fight and called him names. He told them he didn't want to fight. Deceased accused him of things and called him the loathsome name we have referred to. Defendant did not do anything but ran to the red shanty. He testified he did that because deceased and Turner were ready to jump on him. Deceased said the next time they met they would "get me." Defendant testified that on Saturday night before the homicide the next day he went with Parks and wife to Petersburg and returned home about eleven o'clock. He arose Sunday morning about 7:30 or 8:00 o'clock, had breakfast and then sat down and finished reading a book. His mother and Mrs. Tom Stott were there. He stayed home until about 10:30. He never saw deceased that day until he saw him on the station platform at Tice. He didn't see him drive the cows past his father's house. He didn't leave the house Sunday morning until he went to the depot. Stott and Turner were there. In five or ten minutes deceased came up. The first he saw of deceased was on the platform, about ten feet from witness. He was coming toward defendant and it looked like he was going to strike. He said nothing until he came within a foot of defendant. Defendant threw up his arm and said he didn't want any trouble with him. Deceased pulled off his coat, came back and started to strike defendant. He hit him once on the shoulder, on the chest and in the sides. The blows staggered defendant back. Deceased was facing northwest and defendant's back was to the northwest. While deceased was striking, de-

fendant pulled the knife out of his pocket on the right-hand side. He opened it, and as he did so felt the ground shaking under him. The train was coming up when deceased hit him and started pushing him back. Defendant said he could not have been over a foot from the track. On being asked what happened then, he said he could not exactly tell until his dad caught him by the shoulder. He did not know he cut deceased with a knife, because "things went kinda black in front of my eyes; I was expecting the train to hit me any minute." His father separated them and had hold of deceased with one hand and defendant with the other. He struck no blows after his father separated them and told deceased to go home and told defendant the same. Defendant started up the railroad track toward his father's house. After he had gone east he turned and saw deceased fall. He started back to help him. Defendant testified he thought deceased was going to push him under the train when he used the knife. He didn't intend to kill him. He gave the knife to his father as they were going home. He never said to his father he had got deceased and they would get him if he didn't get away, or that in substance. His father never told him he had got him but to go home and wait until he came, or that in substance. He remained at home until the sheriff came and took him to the county jail. He testified he got the knife from a family named Clark, who moved away and forgot the knife. He got it about a month before the homicide. It was dull and the point was broken off. He sharpened it and put a point on it. He sharpened it to half-sole his boots with it, which he did the Sunday before the trouble. He never sharpened it or put a point on it for the purpose of using it in any trouble with deceased. The knife was not described by the witnesses, but it apparently was an ordinary pocket knife.

The conductor on the train which arrived at Tice Station at the time of the combat was Warren C. Corey. He testified that as the train approached the station he went

down on the steps before arriving at the depot. He saw two boys and a man standing in a triangular form. One boy was to the northwest and one to the southeast. One of them was crouched as if intending to fight. He thought they were playing. The boy at the southeast corner of the triangle was close to the depot building. The other one was perhaps six feet from the train. The boy next to the train was facing southeast, and the boy at the corner of the building was perhaps six feet from the train. They were about eight feet apart. When he first saw them one of them was four or five feet from the track and backing. Witness was afraid the train would hit him. They were pretty near the track when the man came up and separated them.

George Wylie, the fireman on the engine of the train, said that as they were coming into the station he saw two boys, one with a sweater on, standing against the depot. (Deceased wore a red sweater.) The other was standing next to the track as the train came along. The boy with the sweater on hauled his coat off and threw it back in the depot, and he saw one lick struck. He didn't know whether more than one lick passed, but just as the engine was approaching a gentleman stepped in and grabbed the two boys and shoved them away from the train. He caught them and held them apart. The one that had on no sweater (defendant) was closer to the track—not over a foot and a half away from the pilot of the engine as it passed. The gentleman who separated them had hold of them when the train pulled out. Witness saw no blows struck after he got hold of the parties.

Harry Hamilton testified that he saw an altercation between defendant and deceased a year and a half ago. They started quarreling and deceased struck the defendant three or four times, and defendant went off, crying. He didn't fight back.

More than twenty witnesses for defendant residing in the neighborhood of deceased, some of whom had seen him

attack and beat defendant, testified the general reputation of deceased in the community prior to the date of the homicide as being a quarrelsome, fighting, troublesome and revengeful man was bad. Twenty-five witnesses testified for defendant that his reputation in the vicinity prior to the homicide as a peaceable and law-abiding citizen was good.

We have endeavored to give the substance of the material testimony for both sides. There was some other testimony, but we do not regard it as of any material importance in the decision of this case. The only defense relied on by defendant was that the killing was done in self-defense.

Fifteen instructions were given by the court at the request of counsel for the People and twenty-five at the request of counsel for defendant. The court refused some instructions requested by defendant, and it is insisted the court erred in giving certain instructions on behalf of the People and in refusing instructions requested by defendant. People's instruction No. 3 is complained of as erroneous and prejudicial. It was as follows:

"The court instructs the jury, that to reduce an unlawful killing from murder to manslaughter, the killing must have been the result of a sudden, violent impulse of passion, supposed to be irresistible, and under the influence of which the party killing acts without opportunity for judgment or reason to restrain or control the impulse. If the person killing acted premeditatedly, or prepared for the act, or intended to kill the other a sufficient length of time before the killing to have enabled him to resist the impulse to kill, then the killing is not manslaughter."

The instruction embraces the substance of part of section 144 of the Criminal Code, which defines voluntary manslaughter. The last sentence of the instruction tells the jury if the person killing acted premeditatedly or intended to kill the other long enough before the killing to enable him to resist the impulse to kill, "then the killing

is not manslaughter," which is equivalent to saying the killing would be murder. In this case the killing was proved and not denied. The defense was that the homicide was committed in self-defense. If the circumstances and appearances at the time of the killing are such as to justify a reasonable man in the belief that he was in imminent danger of losing his life or receiving great bodily harm, acting under the influence of such belief from the appearances, if he kills a person so threatening him the homicide would neither be murder nor manslaughter but would be justifiable. In such case the person killing, if the appearances are such as to induce in the mind of a reasonable person the belief that he was about to lose his life or receive great bodily harm, may intentionally and premeditatedly use a deadly weapon in self-defense and intend to kill his opponent without being guilty of either murder or manslaughter. The instruction, especially the last sentence of it, was calculated to mislead the jury. The defense was not that the killing was the result of sudden and violent impulse or passion but that defendant acted in self-defense. Section 144 of the Criminal Code was given as an instruction in *People* v. *Davis,* 300 Ill. 226. The court said the instruction had no application to a plea of self-defense and substantially eliminated deliberation and intention, which are elements present in self-defense and are no impediment to that defense. "A man may deliberately and intentionally use a deadly weapon in self-defense, and he may intend to kill his opponent, and yet not be guilty of either murder or manslaughter." The instruction was condemned in that case. We think the jury might likely understand from instruction No. 3 that if defendant intentionally stabbed and killed Tice the killing would be murder. This would not be true if the fatal blow was struck in self-defense under such circumstances as we have referred to. The instruction should not have been given.

Instruction No. 5 is as follows:

"The court instructs the jury, that the defendant, charged with murder in this case, cannot avail himself of the plea of necessary self-defense, if the necessity for the killing, if there was a person killed by him, was brought on by the defendant's own deliberate and wrongful act."

It is contended the instruction implied that the court thought defendant was the assailant, while the evidence clearly shows deceased made the attack and struck defendant the first blow. We cannot say the evidence is conclusive on this question, but the preponderance of it tends to show that deceased was the assailant. The instruction, in the form given, was calculated to prejudice defendant. It told the jury defendant could not avail himself of the plea of self-defense if the necessity for the killing was brought on by his own wrongful act. It does not tell the jury that if the evidence showed beyond a reasonable doubt, or even if it was shown by the evidence, that defendant brought on the necessity for the killing he could not avail himself of the plea of self-defense. It was a mere statement of an abstract proposition without reference to what the evidence showed and was prejudicial to defendant.

Some other instructions given for the People are ·objected to on various grounds. Instruction No. 7 defined malice. Upon the margin of the instruction appeared the figures "175-229," and it is not denied that the figures refer to the case of *McCoy* v. *People,* 175 Ill. 224. That case was read by counsel for the People to the jury, and it is complained that while the instruction given in that case was proper, because no question of self-defense was involved, such an instruction is improper in this case where that is the only defense. The instruction contained a correct definition of malice. A similar instruction was given at the trial of *People* v. *Durand,* 307 Ill. 611, where the only defense was self-defense. The court said the instruc-

tion ignored the law of self-defense and for that reason was erroneous.

Some other instructions also contained on the margin figures made by pencil, referring to volume and page of Supreme Court decisions. This was error, but we are of opinion if that were the only error in the record it would not justify a reversal of a judgment of conviction.

We need not further discuss objections made to other instructions. Those instructions we have held to be erroneous are, we think, the most seriously objected to.

There was conflict in the evidence as to which of the parties was the aggressor and as to whether the fatal blow was struck after the parties had been separated by defendant's father. We shall make no special comment upon what the evidence warranted the jury in finding upon that question. We have endeavored to set out pretty fully all the evidence which throws any light upon those questions. A reviewing court will not substitute its judgment for that of the jury upon the evidence and will not reverse a judgment of conviction simply because the evidence is conflicting. Where the evidence may be considered close, or where it is conflicting, the jury should be accurately instructed, and if a reviewing court is of opinion some of the instructions were erroneous and prejudicial to the defendant the judgment will be reversed. Instructions are given to aid the jury in deciding the case (*Filippo* v. *People,* 224 Ill. 212,) and should be accurate, especially where the evidence upon the material facts is conflicting. (*People* v. *McDowell,* 284 Ill. 504; *People* v. *Scott,* id. 465; *People* v. *Davis, supra; People* v. *Burns,* 300 Ill. 361; *Foglia* v. *People,* 229 id. 286; *People* v. *Duncan,* 315 id. 106.) It is true, instructions are to be considered as a series, but the error in giving the instructions we have mentioned could not be cured by giving another instruction on the same subject which was correct. *People* v. *Casino,* 295 Ill. 204.

In view of the character of the evidence in this case on both sides and the errors in giving the instructions we have referred to we feel it our duty to reverse the judgment. We have not discussed all the errors in instructions complained of, but as the case is to be tried again, what we have said will be a sufficient guide on another trial to enable the court to avoid error in giving instructions.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*