(No. 22232.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* STANLEY TAMBORSKI, Plaintiff in error.

*Opinion filed February 23, 1934—Rehearing denied April 10, 1934.*

JOHN OWEN, for plaintiff in error.

OTTO KERNER, Attorney General, THOMAS J. COURT-
NEY, State's Attorney, and J. J. NEIGER, (EDWARD E.
WILSON, J. ALBERT WOLL, and HENRY E. SEYFARTH, of
counsel,) for the People.

Mr. CHIEF JUSTICE ORR delivered the opinion of the
court:

Stanley Tamborski (hereinafter called defendant) sued
out this writ of error to review a judgment of the crimi-
nal court of Cook county wherein he was found guilty
of manslaughter by a jury and sentenced to an indetermi-
nate term in the penitentiary. Only two points are briefed
and argued by defendant, viz.: (1) That the verdict was
against the manifest weight of the evidence; and (2) that
the trial court erred in giving certain instructions for the
People.

At about eleven o'clock in the evening of August 11,
1932, Nicholas Sokol, Jr., was sitting on the front steps
of his father's house, in Chicago. A friend, Steve Soukup,
was with him. Frank Szumal walked by the house with

a girl companion, and as they did so Frank remarked to the girl that the fact of their company together would soon be all over the neighborhood. About fifteen minutes later Sokol, Jr., escorted his friend Soukup toward the latter's home. The two met Szumal, his brother, Andy, Joe Kleaderman and defendant on the corner of Fifty-second street and Kilbourne avenue. A fight started. The evidence is clear on that but is in conflict as to who started it. Sokol, Jr., lost the fight and went home, where he recounted his troubles to his parents. Thereupon Sokol, Sr., Sokol, Jr., and Mrs. Sokol, proceeded to 5228 South Kilbourne avenue, where the Szumals lived. The four men who had engaged in the affray with Sokol, Jr., were standing on the walk in front of the house. According to Sokol, Jr., he asked defendant to give his name. This he refused to do and turned to Sokol, Sr., and told him to keep out or he would get what his son got. He then grabbed hold of Sokol, Sr., forced him against the Szumal front fence, held him in his arms and kicked him forcibly in his privates. Sokol, Jr., said that he went to help his father and chased Frank Szumal across the street and then started back to his father, and that upon his approach defendant dropped his father to the ground, gave him a parting kick and fled. Sokol, Jr., and his mother helped his father home and put him to bed. The son examined him and found his back bruised and discolored, with the skin off in places. On his wrists, penis and testicles he noticed black marks. On the morning of August 12 a doctor was called to treat Sokol, Sr. This doctor testified that on examination he found the patient almost pulseless, the abdomen hard and distended, the pelvic region bruised and discolored, the testicles swollen about once and a half their normal size, and the patient in great pain. On August 12 Sokol, Sr., was taken to the county hospital and operated upon. The operating surgeon testified that the operation was acute, as the patient was bled

white and gave indications of hemorrhage within the abdomen. The operation disclosed that the hemorrhage came from a rupture or tear in the kidney. The kidney was removed to bring about a cessation of the hemorrhage, but Sokol, Sr., died four days later.

Defendant testified that the first encounter between Sokol, Jr., and the two Szumal men, Kleaderman and himself was a general fight, which Sokol, Jr., left with the warning to defendant to get flowers for his grave. When Sokol, Jr., returned with his father and mother he pointed his right hand toward defendant, kept his left hand in a pocket and told defendant to stand still, as he had him covered. Sokol, Sr., asked defendant to give his name, which he refused to do. Sokol, Sr., then attempted to strike defendant. According to defendant he dodged this blow, and Sokol, Sr., grabbed hold of him and held him up against the fence, all the time trying to strike him. The struggle soon broke up and defendant went home. He denied kicking Sokol, Sr., at any time, and said that when he left the scene his adversary was not down on the ground. He further related that after he left Sokol, Sr., the latter started to chase Frank Szumal, who was chasing Sokol, Jr., and that during this chase Sokol, Sr., fell over a wire fence onto the street. It is to this fall that the defense attributes the injuries of Sokol, Sr., from which he eventually died.

No necessity devolves upon this court to state in abstract form the mass of conflicting testimony. A careful examination of the record convinces us that the verdict was not against the manifest weight of the evidence. Although the evidence is highly conflicting, this court has often said that it will not set aside a verdict or judgment of conviction merely because such was the case. (*People* v. *Bond,* 281 Ill. 490; *People* v. *Hohimer,* 271 id. 515.) There must be evidence which is so unsatisfactory that it would warrant entertaining a reasonable doubt of guilt.

(*People* v. *Martellaro,* 281 Ill. 300.) The evidence here was not of that character. The weight of the evidence was for the jury, and a study of all the testimony does not reveal reasonable doubt as to the guilt of defendant. That being so, we will not disturb the verdict on account of the first point raised. *People* v. *Cassidy,* 283 Ill. 398; *People* v. *Barnwell,* 296 id. 67; *People* v. *Vehon,* 340 id. 511.

The first instruction complained of by defendant is one given for the People, advising the jury how to treat the testimony of an accomplice. Defendant does not question the legal validity of this instruction but claims that it is not applicable to the case because none of the participants in the fights who testified for the People could be legally termed an accomplice of defendant. The record shows ample ground for the giving of the instruction. Frank and Andy Szumal, Kleaderman and defendant were confederates in the fight against Sokol, Jr. The same men, with the exception of Kleaderman, were confederated against Sokol, Sr., and his son in the second fight. The testimony of Sokol, Jr., that when he endeavored to go to the aid of his father Andy Szumal tried to, and did, divert his attention by attacking him with a bottle, and that Frank Szumal struck him in the chest with a brick, was enough to warrant the inclusion of the instruction. There is also evidence in the record that the two Szumal men attacked and struck Sokol, Sr. Under the definition of an accomplice in *People* v. *Hrdlicka,* 344 Ill. 211, the instruction was properly given. Additional objections to the first instruction are that it first assumes that the two Szumal men were *particeps criminis,* because it says: "The testimony of a witness who is in no way implicated in the offense," etc., and further because it assumes that a crime was in fact committed by saying, "They should give it the same weight as would be given to the testimony of a witness who is in no respect implicated in the offense." The instruction makes no such alleged assumptions. It properly

says that the testimony of an accomplice is liable to grave suspicion, but if the testimony does carry conviction the jury should treat it the same as the testimony of a person who is not an accomplice. It merely left the jury in the position of applying a legal proposition to facts as found by them. This was not error. *People* v. *Harris*, 263 Ill. 406.

The court instructed the jury for the People that if they believed from the evidence that defendant, at about the time the charge was preferred against him, fled to a distant place, and that such flight was induced by the charge, the jury might consider the same in determining the guilt or innocence of defendant. We do not know what the jury believed on this point, and we cannot decide the question by guessing or indulging in surmises. The evidence shows that defendant (and his was the only testimony on the subject) slept at home the night of the fight and then remained away from home but stayed in Chicago, and that when he heard of the death of Sokol, Sr., he obtained legal advice and then gave himself up to the authorities. A policeman testified that a perfunctory search was made for defendant. Under this evidence the giving of this instruction was not reversible error, as we cannot say whether the jury believed that defendant fled to escape the charge or not. We will not reverse upon mere conjecture, and especially not where, as in this case, there was ample evidence, other than that of flight, upon which to fasten defendant's guilt.

Instructions on manslaughter given for the People and involving self-defense are questioned by defendant. They are as follows:

"The court instructs the jury, as a matter of law, that in determining whether a killing is justifiable on the grounds of self-defense as defined in these instructions, you should consider all the circumstances appearing in evidence attending the killing, and immediately previous thereto, and

the means used, and the degree of force used by the defendant, so far as such facts and circumstances appear in evidence in the case, as bearing upon the question whether it was given in carrying out an unlawful purpose."

"The court instructs the jury, as a matter of law, that before a defendant can avail himself of the right of self-defense as the same is defined in these instructions, it must appear to him, acting as a reasonable person, that at the time of the killing the danger was apparently so urgent and pressing that in order to save his own life or to prevent his receiving great bodily harm, the killing was an absolute necessity."

During the trial defendant contended that he was interposing a plea of self-defense, justified on the theory that when the Sokols approached him he was put in fear of suffering bodily harm, and that Sokol, Sr., grabbed hold of him. Defendant now claims that these instructions are bad because they assume that Sokol, Sr., was killed by defendant. He bases this assertion upon his statement that he at no time kicked or struck the deceased in such manner as would have caused his fatal injuries, and that the jury were foreclosed from considering his testimony by these instructions. In support of his stand defendant places great reliance upon the case of *Cannon* v. *People,* 141 Ill. 270, where an instruction on self-defense was held erroneous. That was a murder case where the death penalty had been inflicted. During the course of the trial, evidence of several former arrests of defendant for other offenses was allowed to be introduced over objections, and this primarily caused the reversal of the case. In so concluding we said the effect of this evidence "may have induced the infliction of the extreme penalty." Following this statement other alleged errors in the admission of other testimony were considered, which we there said, "while perhaps not sufficient of themselves to warrant a reversal, should be avoided on a re-trial of the cause."

The instruction on self-defense here referred to was also set out in full and condemned, but with no indication that it, standing alone, would have been reversible error. A comparison of the two above quoted instructions in this case with the condemned instruction in the *Cannon case* also shows that the present instructions are not subject to the same criticism. While in the *Cannon case* the instruction assumed "the killing of deceased, and that defendant gave the blows, cuts and wounds from which he died," in the present instructions the People have simply stated the law hypothetically arising out of a given state of facts—that is, if so found by the jury. This made them free from the objection of assuming certain facts to exist. (*Hopkinson* v. *People*, 18 Ill. 264; *Bond* v. *People*, 39 id. 26.) The terms used were consonant with the defense interposed by defendant. They made no assumptions but were correct statements of abstract legal propositions applicable alike to all prosecutions for homicide where self-defense is an issue.

The final objection is to a given instruction defining voluntary manslaughter. This instruction quoted the language of the statute, and the legal correctness of the instruction is not questioned but its applicability here is challenged upon the ground that the case presents no evidence of voluntary manslaughter. *People* v. *Davis*, 300 Ill. 226, and *People* v. *Bradley*, 324 id. 294, are cited in support of this contention. The voluntary manslaughter instructions in those cases were lengthy. In the *Davis case* the instruction as given was section 144 of the Criminal Code. We there held the instruction inapplicable to a plea of self-defense because it substantially eliminated the question of deliberation and intention. Those elements are present in self-defense and constitute no impediment to the defense. The *Bradley case* contained an instruction which gave the substance of a part of section 144 of the Criminal Code. The last sentence of the instruction informed

the jury that if defendant acted in a manner showing pre-meditation, or had the intention to kill for a time long enough to resist the intention, "then the killing is not manslaughter." In that case the killing was proved and not denied. The defense interposed by defendant in the case at bar was of a peculiar nature. His self-defense plea was based upon his statement that Sokol, Jr., had a gun, and that he was afraid of receiving bodily harm from Sokol, Sr., and therefore had to protect himself. However, he also testified that he did not hit or kick Sokol, Sr., so the injuries suffered by deceased could not have been inflicted by him, and he, therefore, was not to blame for Sokol's death. By his testimony defendant sought to show that Sokol, Sr., suffered the injuries which ultimately killed him from a fall over a wire fence. The two types of defense are inconsistent. If the sole plea had been that of self-defense there might be some merit in the objection made to the voluntary manslaughter instruction. The injection of the other theory of defense, however, left open for the jury the question of who or what killed Sokol, Sr. When it was determined that his death resulted from defendant's attack, it was then proper for the jury, from the evidence before them, to find that defendant's unlawful act constituted manslaughter. This last instruction was one of several dealing with the crime of manslaughter. It only generally defined voluntary manslaughter, and its presence in the case could not, and did not, prejudice defendant, even though evidence of voluntary manslaughter was lacking. While it is not desirable to give an instruction which merely informs the jury as to legal subjects not applicable to the evidence, it is not cause for reversal that one has been given when it has done no harm. *Moore* v. *People,* 190 Ill. 331.

The judgment of the criminal court of Cook county is affirmed.

*Judgment affirmed.*